## COMMONWEALTH vs. NAKIA D. LANE.

Worcester. April 3, 2012. - June 25, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Assault and Battery by Means of a Dangerous Weapon. Firearms. Constitutional Law,* Assistance of counsel, Identification. *Practice, Criminal,* Assistance of counsel, New trial, Witness. *Evidence,* Identification, Absence of witness, Failure to produce witness. *Identification.*

A Superior Court judge did not abuse his discretion in granting the criminal defendant's motion for a new trial, where evidence existed in the record to support the judge's conclusion that, after counsel had essentially promised in his opening statement that the jury would hear from a certain witness who had provided a description of the shooter markedly different from that of the defendant, counsel's decision not to call that witness (because of minor credibility issues) to act as a counterweight to the Commonwealth's sole eyewitness, and to put in dispute the entire theory of the Commonwealth's case, was manifestly unreasonable and deprived the defendant of an otherwise available defense. [597-599]

INDICTMENTS found and returned in the Superior Court Department on August 11, 2003.

The cases were tried before *John S. McCann,* J., and a motion for a new trial, filed on September 25, 2007, was heard by him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Richard B. Klibaner* for the defendant.

*Jane A. Sullivan,* Assistant District Attorney, for the Commonwealth.

CORDY, J. After he was convicted of assault and battery by means of a dangerous weapon and unlawful possession of a firearm and ammunition[1] arising out of the shooting of Angelique Adamuska, the defendant, Nakia D. Lane, moved for a new trial

---

[1] The indictments for unlawful possession of a firearm and ammunition also charged the defendant with being an armed career criminal. See G. L. c. 269, § 10G (*a*). After he was convicted on the underlying offenses, the defendant pleaded guilty to the armed career criminal portions of the indictments.

on the ground that he had been ineffectively represented by his counsel. The judge who had presided over the trial granted the motion, concluding that, in a case in which identity was the central issue and defense counsel had essentially promised in his opening statement that the jury would hear from a witness, Norman Levesque, who had provided a description of the shooter markedly different from that of the defendant, it was ineffective not to call that witness because of minor credibility concerns. In an unpublished memorandum and order pursuant to its rule 1:28, the Appeals Court reversed the judge's order, *Commonwealth* v. *Lane*, 79 Mass. App. Ct. 1116 (2011), and we granted the defendant's application for further appellate review. Because we discern no abuse of discretion or other error of law in the judge's findings and conclusions, we affirm his order granting the defendant a new trial.

*Background.* At the crux of this case is defense counsel's decision not to call Levesque as a trial witness. Therefore, we summarize below the information gathered during the investigation and the evidence presented at trial.

a. *The investigation.* In the early morning hours of June 13, 2003, Adamuska was shot in the stomach by an unknown assailant at a gasoline service station in Worcester. Her friend, Stacey Krasnecky, was standing close to her when the shooting occurred, and claimed to have observed the shooter for a few minutes prior to the assault. When the police arrived at the scene, Krasnecky told them that the shooter was a dark-skinned black male, between five feet, six inches and five feet, ten inches tall, with a "husky" build, who was wearing a white T-shirt, jeans, and a "do-rag" on his head. Several days later, Krasnecky was shown eight photographs in an array that contained the defendant's photograph. She eliminated all but two photographs from the array, one of which depicted the defendant, but could go no further. She later claimed that she had not made a positive identification because she was "too afraid," and testified at trial that she had, in fact, recognized the defendant as being the shooter during the photographic array.[2] This testimony was supplemented by that of two detectives who

---

[2]One month later, Stacey Krasnecky viewed another photographic array from which she selected the defendant's photograph. This identification was suppressed following a hearing conducted by a different judge, as being

administered the photographic array and testified that Krasnecky appeared visibly upset when she looked at the defendant's photograph.

At the time of the shooting, Levesque, who was not known to any of the parties involved, was waiting for a bus in the foyer of the gasoline service station. He witnessed the shooting from that vantage point and telephoned 911 to report the incident. Levesque also provided a statement to the police within hours of the shooting. According to the police report, Levesque described the shooter as a "lighter skinned," potentially "Hispanic or mulatto," male, around five feet, three inches tall, with a "small build," "short black hair" and a mustache, who was wearing a white sleeveless shirt. Like Krasnecky, Levesque was later shown a photographic array containing a photograph of the defendant; he did not, however, recognize any of the people depicted in the array as being the shooter.

Within one hour of the shooting, Worcester police responded to another shooting at an apartment building. There, numerous shots had been fired into the first-floor window of an apartment occupied by the building's landlord. No one witnessed the shooting, but the landlord and the defendant's former girl friend told police, and subsequently testified, that the defendant had made threatening overtures toward the landlord in the past.[3] Subsequent ballistic testing revealed that shell casings recovered from the shootings at the apartment building and the gasoline service station were fired from the same weapon.

b. *The trial.* The Commonwealth's case against the defendant rested on Krasnecky's description of what occurred, her partial identification of the defendant in the photographic array[4] and the evidence connecting the shootings at the service station and

---

flawed and impermissibly suggestive. The judge also barred Krasnecky from making an in-court identification, because there was an insufficient independent basis for such identification.

[3] The defendant's former girl friend was one of the building's occupants, and he had lived with her there during the summer of 2002. After the landlord warned the girl friend that she would be evicted if the defendant continued to live with her, the defendant moved out. Thereafter, he told the girl friend that the landlord's "house should be shot up." Subsequently, in January, 2003, the defendant was seen by the landlord and the girl friend standing in the driveway of the apartment building holding a gun.

[4] Krasnecky was the only witness to the shooting who testified to the

the apartment building. The defense in the case was mistaken identification and focused on the integrity and thoroughness of the police investigation into the identity of the individual who shot Adamuska. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980).

In his opening statement, defense counsel told the jury, "[Levesque] is expected to testify. . . . [H]e saw the shooting, and he saw the shooter. . . . And the description he gave . . . is very different than the description of Nakia Lane. . . . [Lane is] not the small, Hispanic, light-skinned male that was described by Norman Levesque as the person who pulled the trigger." Defense counsel also described Krasnecky's anticipated testimony and suggested to the jury that "the police basically set one description [of the shooter] aside and moved on with the other," after which he highlighted the results of the photographic arrays administered to both Krasnecky and Levesque.

As the trial proceeded, defense counsel established through cross-examination of police witnesses that Levesque had claimed to have observed the shooting, had been interviewed, had described the incident and the shooter to the police, and had been shown a photographic array that contained a photograph of the defendant. Defense counsel, however, was not permitted to elicit from these witnesses the substance of Levesque's description of the events or of the assailant,[5] or whether Levesque had selected the defendant's photograph from the array.[6]

At the conclusion of the Commonwealth's case, defense counsel decided not to call Levesque as a witness. In explaining

---

circumstances of the attack. Adamuska testified that she had "blacked out" during the relevant time period and, therefore, could not describe the attack or the shooter.

[5]Although defense counsel asked two detectives whether they knew that "Norman Levesque said that the shooter was [a five foot, three inch tall], light-skinned Hispanic male with a mustache, in his early twenties, with a small build," the judge sustained objections made by the prosecutor.

[6]Defense counsel was permitted to ask the detectives a line of questions that suggested they had not followed up on the information (not in evidence) provided by Levesque.

For example, defense counsel asked one of the detectives, "You never entered the biographical information into the computer system searching for photographs of a Hispanic male, five-three, slight build, early twenties, short black hair; right?" The detective responded, "No, I did not."

this decision to the judge, counsel stated, "I don't want to call Levesque because I don't have the burden of proof in this case. And I don't want the jury to think that I'm marrying Norman Levesque. This is about the police and what they did, and what they didn't do."

Near the end of the trial, defense counsel requested — and was refused — a missing witness instruction based on the Commonwealth's failure to call Levesque. He was, however, permitted to hypothesize about Levesque's absence in his closing argument, stating "Norman's there. . . . Norman gives a description. . . . They show him a photo array. Nothing happens. And then Norman's gone. He's out of the case. That's it for Norman. It's as if they wanted him out of the case."

c. *The evidentiary hearing.* In deciding the motion for a new trial, the judge conducted an evidentiary hearing, during which trial counsel for the defendant and Levesque testified. Levesque largely reiterated his description of the shooting, but had no memory of the appearance of the shooter. He, however, did recall speaking to the police and verified and adopted the written statement he had provided to them regarding his description of the assailant.

Defense counsel testified that he had spoken with Levesque before and during the trial, but he did not recall the details of their conversations nor did he have any notes pertaining to them.[7] He nonetheless identified a conversation with Levesque that occurred in the hallway of the court house sometime during the trial as the moment he decided not to call Levesque. As a result of that conversation, counsel testified that he viewed Levesque "as a damaged witness," seemingly because of "inconsistencies in what . . . his testimony would be." Counsel also acknowledged that inconsistencies between the testimony of Levesque and Krasnecky "potentially" would have undercut Krasnecky's credibility, and admitted that he was aware Levesque had been convicted of driving under the influence (for the third time) before trial.

d. *The judge's findings and order.* At the outset of his carefully reasoned decision, the judge articulated the relevant legal standards, which we reiterate here.

---

[7]Levesque, in contrast, testified that he had not spoken with defense counsel.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's conduct fell "measurably below that which might be expected from an ordinary fallible lawyer," and that this conduct "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Where a claim of ineffective assistance of counsel is predicated on some error that may fall within the realm of "tactical strategy," such as counsel's decision to call (or not to call) a witness, the defendant must show that the decision was " 'manifestly unreasonable' when made." *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 102 (2004), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). See *Commonwealth* v. *Morales*, 453 Mass. 40, 45-46 (2009). Although judges typically afford "some deference" to counsel's choice of trial tactics, *Commonwealth* v. *White*, 409 Mass. 266, 272 (1991), the fact that a decision "could be characterized as [such] does not, for that reason, render the decision immune from scrutiny." *Commonwealth* v. *Conley*, 43 Mass. App. Ct. 385, 391 (1997).

Applying these principles, the judge determined that "[d]efense counsel's decision to not call an apparently credible and totally disinterested witness to act as counterweight to the Commonwealth's sole eyewitness, and put in dispute the entire theory of the case that the defendant was the shooter, was manifestly unreasonable and deprived the defendant of an otherwise available defense." See *Commonwealth* v. *Hill*, 432 Mass. 704, 717-719 (2000). Cf. *Commonwealth* v. *Delacruz*, 61 Mass. App. Ct. 445, 451-452 (2004), *S.C.*, 443 Mass. 692 (2005). In reaching this conclusion, the judge evaluated the course of the trial and noted that "[b]y failing to put Levesque on the stand in this case, trial counsel was unable to have testimony of Levesque's description of the shooter or his failure to pick [the defendant's] photograph from an array admitted for jury consideration."[8] To the judge, this information was so vital to the case that counsel's

---

[8]Although the thrust of Levesque's expected testimony was referenced in defense counsel's opening statement and closing argument, as well as within some of the questions he posed to prosecution witnesses, the judge properly instructed the jury that opening statements, closing arguments, and questions posed by attorneys "are not evidence." See *Commonwealth* v. *Silva Santiago*, 453 Mass. 782, 806-807 (2009). He also instructed the jury twice that they

decision not to call Levesque because of "trivial inconsistencies"[9] was manifestly unreasonable and ultimately prejudicial where it "left the jury free to believe Krasnecky's partial identification as being the only eyewitness identification of the shooter." Moreover, as the judge explained, defense counsel's reference to Levesque in his opening statement exacerbated the prejudice of Levesque's ultimate absence; the opening had "primed the jury to hear a different eyewitness account" and, when that account was not delivered to them, "the jury could have reasoned that counsel could not live up to the claims made in his opening." See *Commonwealth* v. *McMahon*, 443 Mass. 409, 425 (2005) ("failure to present critical evidence that has been announced in an opening statement can have drastic ramifications").

*Discussion.* "The trial judge upon motion in writing may grant a new trial at any time if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001). Our review of the grant or denial of a motion for new trial is limited to whether the judge's decision constitutes an abuse of discretion or contains any other error of law. *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). See *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990). In connection with this review, we give "special deference" to both the findings of fact, *Commonwealth* v. *Zagrodny*, *supra* at 103, and the ultimate decision of the motion judge where, as here, he also served as the trial judge. *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 467 (1998). "Furthermore, it is irrelevant what the Justices of this court would have done had they been in the position of the trial judge. Our task is only to ensure that there exists in the record before us evidence to support the judge's decision to order a new trial." *Commonwealth* v. *Preston*, 393 Mass. 318, 324 (1984), citing *Commonwealth* v. *Cook*, 380 Mass. 314, 320 (1980).

---

were "not allowed to speculate about what someone who didn't testify in this case might have said if they had actually testified."

[9]The primary inconsistency over which the parties wrestle pertains to the 911 recording. According to the Commonwealth, Levesque told the emergency operator, "I heard the bang. That's all I heard." The judge noted that, according to the transcript of the 911 call, this statement "was not in response to any question as to whether [Levesque] *saw* the shooting," and must be contrasted with the detailed account Levesque gave police shortly after the shooting.

We cannot say that the judge's order fell below this standard. Having presided over the trial and conducted a full evidentiary hearing on the motion for a new trial, the judge was exceptionally well poised to assess the potential impact of Levesque's testimony on the Commonwealth's case, to understand defense counsel's reasons for not calling Levesque, and to scrutinize whether that decision was manifestly unreasonable when made. See *Commonwealth* v. *Preston, supra* (trial judge has "advantage of firsthand evaluation" of witnesses and evidence at trial, and "may be aware of nuances of conduct, tone, and evidence that easily escape the cold record available" on appellate review). In doing so, he did not misapply the law or misconstrue the facts; as such, his decision is entitled to a substantial degree of deference.

The Commonwealth, nonetheless, raises a number of objections to attack the judge's decision and to bolster its assertion that defense counsel acted reasonably and professionally in not calling Levesque. Of primary concern is its contention that the record does not support the judge's finding that defense counsel "promised" in his opening statement that Levesque would testify. While it is correct that defense counsel did not employ this exact phraseology, the judge's interpretation of the opening statement to that effect was not unreasonable. See *id.* Moreover, the opening statement alone was not the fatal flaw in defense counsel's strategy; it merely highlighted the later absence of a crucial witness, the substance of whose testimony was never admitted in evidence. See *Commonwealth* v. *Duran,* 435 Mass. 97, 109-110 (2001) (discussing potential basis for ineffective assistance of counsel claim where counsel fails to call witness to whom he or she alluded in opening statement).

Although we agree with the Commonwealth that the tactical decisions of trial counsel, especially those regarding whether to call a witness that counsel has interviewed, are the type of professional judgments that warrant significant deference and should not ordinarily be the subject of second-guessing, that rule is not absolute. The facts of a particular case may necessitate a more critical review of an attorney's tactical decisions made during trial. Where those decisions are found to be manifestly unreasonable in the case as it unfolds, resulting in serious

doubt as to whether justice was done, a new trial will be warranted. See, e.g., *Commonwealth* v. *Hill*, 432 Mass. 704, 718-719 (2000) (failure to call impartial witness who had testified during codefendant's trial because of minor credibility concerns "not a reasonable strategic decision"). When such claims are brought to this court in the first instance, and "appear[] indisputably on the trial record," we may resolve them through the exercise of our own independent judgment. *Commonwealth* v. *Zinser*, 446 Mass. 807, 811 (2006), quoting *Commonwealth* v. *Adamides*, 37 Mass. App. Ct. 339, 334 (1994). However, where the trial judge has already engaged in the proper analysis, we will not substitute our judgment unless there appears on the record an abuse of discretion or other error of law. Finding no such deficiency in the order before us, we affirm the judge's decision to grant the defendant a new trial.

*Order allowing motion for a new trial affirmed.*