NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08047


COMMONWEALTH  vs.  ENEZ KOLENOVIC.



Hampshire.      December 4, 2014. - June 23, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.


Homicide.  Constitutional Law, Assistance of counsel.  Practice,
    Criminal, Capital case, New trial, Assistance of counsel.
    Intoxication.  Mental Impairment.  Evidence, Intoxication.



    Indictment found and returned in the Superior Court
Department on September 24, 1996.

    The case was tried before Mary-Lou Rup, J., and a motion
for a new trial, filed on March 18, 2003, was heard by her.


    Thomas H. Townsend, Assistant District Attorney, for the
Commonwealth.
    Michael R. Schneider for the defendant.


    HINES, J.  On February 2, 1999, a jury convicted the

defendant, Enez Kolenovic, of murder in the first degree on the

theory of extreme atrocity or cruelty.[1]  The defendant's
conviction stems from the stabbing death of David Walker
(victim) during the early morning hours of September 16, 1996,
following an altercation between the two in a bar.  While the
defendant's appeal to this court was pending, he filed a motion
for a new trial arguing ineffective assistance of counsel and
error in the jury instructions.  We remanded the motion to the
Superior Court.[2]  The judge, who had been the trial judge,
granted the defendant's motion for a new trial based on
ineffective assistance of counsel.  The Commonwealth appealed.
We conclude that the judge erred and reverse the order allowing
the motion for a new trial.

1.  Background.  a. Facts presented at trial.  From the
evidence presented at trial, the jury could have found the
following facts.  In the early morning hours of September 16,
1996, the defendant was riding in the back seat of his friend's
vehicle after a day spent consuming alcohol.  His friend, John
J. McCrystal, was driving; the defendant and another friend,

---

[1] The jury did not find the defendant guilty of murder in
the first degree on the theory of deliberate premeditation.

[2] The defendant also moved for a reduction of the verdict
pursuant to Mass. R. Civ. P. 25 (b), as amended, 420 Mass. 1502
(1995).  The judge denied the motion as to the request for a
reduction in the verdict and the claimed error in the jury
instructions.

Melissa Radigan, were seated in the back seat, and the victim was sitting directly in front of the defendant in the front passenger seat. The defendant and the victim had had an altercation earlier in the evening. The group was on the way to the defendant's house to continue drinking when the defendant reached forward and slit the victim's throat. McCrystal stopped the vehicle, and the defendant got out, opened the front passenger door, and pulled the victim to the ground. The defendant stabbed the victim multiple times while he lay on the concrete.

The defendant spent the hours before the murder drinking to excess. Beginning at approximately 12:45 P.M., the defendant, accompanied by a friend, David Bruso, consumed at least two beers and two double shots of one hundred proof alcohol at a bar owned by McCrystal.[3] At 2:30 P.M., the defendant and Bruso left the bar, stopped at the liquor store Bruso owned to obtain eight to ten single-shot bottles of one hundred proof alcohol, and went to a barbecue at the local Knights of Columbus hall. The two consumed the single-shot bottles, and the defendant also drank more than six beers and more than four shots of seventy-proof alcohol.

---

[3] John J. McCrystal owned the building housing both his bar and the defendant's family's restaurant; he leased the restaurant portion to the defendant's family.

While at the barbecue, the defendant ran into Radigan, who was attending the event with her mother and sister. For a brief time, the defendant and Radigan left the barbecue and returned to McCrystal's bar where they each had a drink. The two went back to the barbecue, where they continued to drink and fell down when they attempted to dance together.

The defendant and Radigan left again at about 9:30 P.M. to return to McCrystal's bar. Later in the evening, the defendant telephoned McCrystal to ask him to come to the bar to give the two a ride home. McCrystal arrived and saw the defendant and Radigan in the restaurant portion of the building. McCrystal then entered the bar to wait. The victim arrived shortly thereafter. The defendant and Radigan left the restaurant area, entered the bar, and sat next to McCrystal. The defendant ordered a cognac on the rocks, and Radigan and McCrystal both ordered a beer. The bartender hesitated in serving the defendant and Radigan because both appeared to "have been drinking quite a bit." The bartender served the two only after McCrystal said he was driving them home.

The altercation with the victim, a bar patron, began at approximately 11 P.M. The defendant had thrown a drink on Radigan. The victim reprimanded the defendant by telling him, "You don't do that to a lady" and "You don't treat a lady like that." The defendant approached the victim, repeating, "Don't

cross my path." The defendant challenged the victim to take their dispute outside; after trying to ignore the defendant, the victim agreed.

The two men continued their argument outside, frequently bumping chests. As the bar was across from the police station, a police officer arrived quickly and asked them to break it up. The officer recognized the two men and told them he did not want any "problems out here on the street." Each man responded that there was no problem and returned inside. The defendant then bought the victim a beer.

The parties were joined at the bar by Bruso, who had spent several hours asleep in his vehicle after leaving the barbecue. Bruso described the defendant's demeanor, noting that "his eyes were very glossy. He seemed very intoxicated to the point of almost being asleep, but not asleep. His eyes were open." Although Bruso had seen the defendant intoxicated on many occasions, he noted that "it was the drunkest I've ever seen him." Another patron, Irene Grigas, who arrived after the altercation with the victim, similarly noted that she had never seen the defendant in that state. Bruso offered to give the defendant a ride home but McCrystal told Bruso that he was giving the defendant a ride. Bruso left the bar.

The bartender started to close the bar about 12:30 <u>A</u>.<u>M</u>. and the defendant, Radigan, and McCrystal made plans to go back to

the defendant's apartment to "keep the party going."  The victim declined McCrystal's invitation to join them, opting instead to assist the bartender in closing for the night.  Before departing, the defendant went to the restaurant side of the building, where he remained for about five minutes before meeting with the others.  While inside, he put on a winter jacket that he stored at the restaurant, even though the weather was "nice" and the evening was an "Indian Summer September type of night."

McCrystal carried some beer to his vehicle, where he sat in the driver's seat to await the defendant.  Radigan joined him and sat in the front passenger seat.  The defendant arrived; when he was told the victim would not be joining them, he returned to the bar.  After a few minutes, the defendant emerged from the bar followed by the victim.  The defendant asked Radigan to get in the back seat.  Radigan complied and sat behind McCrystal.  The defendant directed the victim to sit in the front passenger seat and he sat in the back seat behind the victim.

McCrystal drove the short distance to the defendant's apartment complex, stopping for a few minutes to talk to a police cruiser that pulled alongside his vehicle.  About one hundred yards from the complex, the defendant leaned forward and put his arm around the victim.  McCrystal admonished them

because he thought the two were "fooling around." Radigan heard McCrystal shouting and then saw the defendant lean forward toward the victim. In the immediate aftermath of that event, both McCrystal and Radigan felt and saw blood. McCrystal stopped the vehicle.

The defendant pulled the victim from the vehicle and continued to stab him. McCrystal shouted to the defendant to stop and "get off him, you're going to kill him." The defendant replied, "I think it's too late for that." McCrystal was able to push the defendant off the victim when he noticed, for the first time, that the defendant had a knife in his hand. McCrystal recognized the knife as the type the defendant used at his family's restaurant.

The defendant said to McCrystal, "You've got to be with me on this." McCrystal responded, "What, are you crazy? . . . No way." The defendant's face then became more serious and he ran past McCrystal into the driver's seat of McCrystal's vehicle. McCrystal attempted to reach through the window and shut off the engine but was unsuccessful. In response to a resident's telephone call, Scott J. Crevier, a Ware police officer, arrived just as the defendant entered McCrystal's vehicle. While the defendant was turning the vehicle around in the parking lot, Crevier attempted to block the exit with his cruiser. The defendant "narrowly missed" striking the cruiser and took off

out of the parking lot. After a high speed car chase, at times approaching 110 miles per hour, police eventually were able to apprehend the defendant, who resisted handcuffs until he was sprayed with mace.

Police accompanied the defendant to the hospital at 2:55 A.M. to be treated for the after-effects of the mace. The defendant smelled of alcohol and admitted to drinking a lot. The emergency room physician did not perform any alcohol ingestion evaluation because the defendant's "gait was normal, his speech was clear, his coordination was intact, [and] he was cooperative." Later, at the police station, a police officer observed that the defendant's eyes were "bloodshot, glassy, and watery"; his speech was "very slow"; and he "took a while" to answer questions.

The victim was pronounced dead at 1:28 A.M. The medical examiner who performed his autopsy opined that the victim suffered a "major fatal wound" that was one inch deep and six and one-half inches long and wrapped from the midline of the victim's neck to behind his ear. The victim had a total of nine knife wounds to his neck, head, chest, abdomen, shoulder, and back.

The defendant presented an intoxication defense at trial, seeking to persuade the jury that because of his long-standing history of alcoholism and his excessive consumption of alcohol

in the twelve hours preceding the killing, he was not capable of forming the specific intent required for deliberately premeditated murder or to act with extreme atrocity or cruelty in causing the victim's death. Three witnesses -- David Bruso, Irene Grigas, and Dr. Robert A. Fox, Jr. -- testified in support of the defendant's theory of defense.

As already noted, Bruso and Grigas recounted aspects of the day of drinking and the defendant's demeanor while in their presence. Dr. Fox, a psychiatrist with an expertise in substance abuse, opined that because of the defendant's level of intoxication at the time of the killing, the defendant's thinking and reasoning functions would have been highly impaired and his higher functions required to premeditate, form intent, or to process what he was doing would have been impaired. He opined that the defendant's blood alcohol content at the time of the murder was likely between .26 and .3 per cent,[4] and explained the physiological effects of alcohol on the body, including on the ability to think, reason, remember, make connections, and concentrate, and the lowering of a person's inhibitions.

---

[4] Two breathalyzer tests were administered to the defendant approximately four hours after the murder. At that time, his blood alcohol level registered .17 and .16 per cent. The defendant's blood alcohol content at the time of the murder was extrapolated from these two tests.

b.  The motion for a new trial.[5]  In his motion for a new
trial, the defendant argued that trial counsel was ineffective
in "fail[ing] to fully investigate, present and argue evidence
of the defendant's severe neuropsychiatric disorders."  The
judge conducted an evidentiary hearing and considered first the
"performance prong" of the Saferian test, or whether counsel's
performance fell "measurably below that which might be expected
from an ordinary fallible lawyer."  Commonwealth v. Saferian,
366 Mass. 89, 96 (1974).  The judge concluded that the defendant
met the performance prong of the Saferian test because "further
evaluation of the defendant's mental condition would have done
nothing to diminish and potentially much to enhance the only
possible defense available to the defendant."

As a preface to our analysis of the Commonwealth's claim of
error, we summarize the evidence presented at the hearing and
relied on by the judge in her decision.[6]  The evidence at the
hearing consisted of testimony from trial counsel; Dr. Fox, the

---

[5] We note that the judge devoted an extraordinary level of
attention to the issues raised by the defendant's motion.  The
motion for a new trial was filed on March 21, 2003, and after a
series of hearings, the motion, which was analyzed in two
comprehensive memoranda of decision issued on January 19, 2010,
and November 12, 2013, was allowed.

[6] Because we do not reach the prejudice prong of
Commonwealth v. Saferian, 366 Mass. 89 (1974), we do not detail
the evidence on that issue.

expert retained by trial counsel to conduct a pretrial assessment of the defendant's history of alcohol dependence and intoxication level; and affidavits from three experts, retained after trial.

The defendant's trial counsel, found by the judge to be an experienced and successful criminal trial attorney, was retained by the defendant's family to represent the defendant at the trial. The attorney met with the defendant ten or more times in preparation for the trial. During those meetings, he "perceived no evidence of mental illness or impairment" and received no information from the defendant or his family to suggest any mental abnormality. Recognizing, however, that the defendant was highly intoxicated at the time of the murder, the attorney retained the services of Dr. Fox and requested an opinion whether, because of the defendant's alcohol consumption, the defendant had the "ability to form the specific intent necessary for first degree murder." Although the request was limited to this question, counsel did not object to a full psychiatric evaluation of the defendant.

Dr. Fox examined the defendant over the course of eight hours and thereafter advised trial counsel that he was prepared to opine at trial that the defendant was incapable of forming the specific intent required for murder in the first degree. In a letter written subsequent to the initial meetings with counsel

and a few days before trial, Dr. Fox stated his opinion to "a reasonable degree of medical certainty . . . that [the defendant] was unable to appreciate the wrongfulness of his act and was unable to conform his conduct to the requirements of law." He also informed counsel that he believed that the defendant had a dual diagnosis of posttraumatic stress disorder (PTSD) and alcoholism, and suggested further testing by a PTSD expert. Counsel, however, declined to seek further evaluation of the defendant for PTSD after meeting with Dr. Fox several times during the trial preparation and after considering all of the other information available from his investigation into the case. He decided, as a matter of strategy, to pursue only an intoxication defense and to limit Dr. Fox's trial testimony to the defendant's history of alcohol dependence and intoxication at the time of the murder.

Counsel's explanation for this strategic choice was that he believed, based on his experience as a criminal defense lawyer, "that juries almost never accept an insanity defense." The attorney added that (1) he believed a dual defense based on both intoxication and PTSD could cause a loss of credibility with the jury and the PTSD defense could water down the substantial evidence he had developed to support an intoxication defense; and (2) he was skeptical of some of Dr. Fox's conclusions and thought the PTSD defense was based on a "shaky factual

foundation." He believed there was a "real chance that [the intoxication] evidence was strong enough to win a manslaughter verdict" because it was based on undisputed evidence demonstrating the defendant's lengthy history of alcoholism and extreme amount of alcohol he had consumed at the time of the killing. He noted as well his concern that a defense of lack of criminal responsibility would allow the Commonwealth's experts to have access to the defendant and vitiate the advantage of the overwhelming evidence of the defendant's intoxication.[7]

The judge credited the attorney's explanation of his strategic decisions and his recollection that he had discussed the decision with the defendant, who had agreed with counsel's strategy. In addition, she found that defense counsel "did not ignore Dr. Fox's opinion that the defendant suffered as well from PTSD, [but] he made a tactical decision that the PTSD defense suggested by Dr. Fox was unlikely to succeed." The judge also found that trial counsel "vigorously argued all the evidence [and] succeeded in part, as the jury found the defendant not guilty of murder by deliberate premeditation." At the same time, she noted that counsel had only a rudimentary

---

[7] The judge noted that only McCrystal disputed the extent of the defendant's intoxication but observed that McCrystal had a "clear motive" to minimize because of the possibility of a civil lawsuit as the owner of the bar where the defendant consumed alcohol in the hours before the killing.

understanding of PTSD and had based his decision to forgo further investigation of the condition on his personal assessment of the defendant during their meetings. In addition, she noted defense counsel's "general lack of faith in psychiatry . . . as a defense in criminal trials."

Dr. Fox confirmed that he had reported his PTSD diagnosis to trial counsel in advance of the trial and advised the attorney to pursue further evaluation of that condition. Dr. Fox recalled that at one of the trial preparation meetings, trial counsel advised him that he intended to present only the intoxication defense and explained that his questions during the trial would be limited to that issue. In recounting his pretrial involvement with trial counsel, however, Dr. Fox criticized counsel's strategic choices and testified that he disagreed with counsel's intoxication defense strategy. He expressed "frustrat[ion]" that he did not have the "opportunity" for a full discussion of the issue with counsel. As to this point, however, the judge found that Dr. Fox told defense counsel that "PTSD might be a defense worth pursuing" and that "further evaluation and objective testing would be useful if the defense were to be presented in court" (emphases added). The judge made no finding that Dr. Fox ever expressed to counsel his disagreement with the trial strategy. As the trial record

demonstrates, Dr. Fox testified at trial in accordance with trial counsel's defense strategy.

The three experts, in their affidavits based on extensive posttrial testing and interviews with defendant's family, definitively diagnosed the defendant with PTSD and other mental diseases, including alcohol dependency, brain injury, intermittent explosive disorder, dysthymic disorder, social phobia, generalized anxiety disorder, and several unspecified personality disorders.[8]  All of these experts opined that because of the defendant's multiple mental disorders, he lacked the capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law.

2.  Discussion.  a. Standard of review.  "In the absence of constitutional error, a motion for a new trial is addressed to the sound discretion of the trial judge," Commonwealth v. Smith, 381 Mass. 141, 142 (1980), who may grant a new trial "if it appears that justice may not have been done."  Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001).  Judges are to apply the rule 30 (b) standard rigorously and should grant such motion only if the defendant comes forward with a credible reason that outweighs the risk of prejudice to the Commonwealth.

_____

[8] The experts did not all diagnose the same mental diseases, with the exception of posttraumatic stress disorder, alcohol dependency, and brain injury.

Commonwealth v. DiCicco, 470 Mass. 720, 728 (2015), citing Commonwealth v. Fanelli, 412 Mass. 497, 504 (1992).  On the Commonwealth's appeal of the grant of a defendant's motion for a new trial, we consider whether the judge committed a significant error of law or abuse of discretion in allowing the defendant's motion.  Commonwealth v. Lane, 462 Mass. 591, 597 (2012).  That discretion, however, "is not boundless and absolute."  See Commonwealth v. Genius, 402 Mass. 711, 714 (1988).  Under the abuse of discretion standard, the issue is whether the judge's decision resulted from "a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted).[9]  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

On review, "[a] judge's findings of fact after an evidentiary hearing on a motion for a new trial will be accepted if supported by the record."  Commonwealth v. Walker, 443 Mass. 213, 224 (2005).  Where, as here, the motion judge is also the

_____

[9] In L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), we "retired" the prior standard for abuse of discretion that deferred to the judge except on a showing that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by [her]" (quotation and citation omitted).  While deference is still appropriate, the revised abuse of discretion standard confirms that an appellate court is entitled to correct a decision that is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.

trial judge, we give "special deference" to the judge's findings of fact and the ultimate decision on the motion.  Lane, 462 Mass. at 597.  We consider the record in its entirety, however, to determine whether "there exists in the record before us evidence to support the judge's decision to order a new trial." Id., quoting Commonwealth v. Preston, 393 Mass. 318, 324 (1984).

b.  Ineffective assistance of counsel.  "Where a new trial is sought based on a claim of ineffective assistance of counsel, the burden of proving ineffectiveness rests with the defendant." Commonwealth v. Montez, 450 Mass. 736, 755 (2008), citing Commonwealth v. Comita, 441 Mass. 86, 90 (2004).  We begin the analysis with an overview of the legal principles underlying the judge's allowance of the defendant's motion for a new trial on the ground of ineffective assistance of counsel.  Under the familiar Saferian test, a defendant is denied constitutionally effective assistance of counsel if the representation fell "measurably below that which might be expected from an ordinary fallible lawyer," and that the performance inadequacy "likely deprived the defendant of an otherwise available, substantial ground of defence."  Saferian, 366 Mass. at 96.  The Saferian test is implicit recognition that the constitutional interest undergirding the assistance of counsel jurisprudence is the right to a fair trial.  Although a claim of ineffective assistance of counsel may not prevail unless counsel's

performance affects the fairness of the trial, we need not reach that analysis if we determine that counsel's representation did not fall measurably below that which might be expected from an ordinary fallible lawyer.  See Commonwealth v. Haley, 413 Mass. 770, 775 (1992).  See also Strickland v. Washington, 466 U.S. 668, 689 (1984) ("[T]he purpose of the effective assistance guarantee . . . is simply to ensure that criminal defendants receive a fair trial," not to "improve the quality of legal representation, although that is a goal of considerable importance to the legal system").  "In cases where tactical or strategic decisions of the defendant's counsel are at issue, we conduct our review with some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful." Commonwealth v. Valentin, 470 Mass. 186, 190 (2014), quoting Commonwealth v. White, 409 Mass. 266, 272 (1991).  This measure of deference is as it must be because, ultimately, counsel alone has the benefit of the full factual picture that dictates the choice of those matters to be revealed to the fact finder and those that are better left unexposed to court room scrutiny. From that vantage point, counsel "knows best how to defend a client."  Commonwealth v. Glover, 459 Mass. 836, 843 (2011).

Where, as here, the defendant's ineffective assistance of counsel claim is based on a tactical or strategic decision, the test is whether the decision was "'manifestly unreasonable' when

made." Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006), quoting Commonwealth v. Adams, 374 Mass. 722, 728 (1978). The inquiry involves both temporal and substantive considerations. The temporal consideration limits the effect of hindsight by requiring a focus on the point in time when counsel made the challenged strategic decision. Glover, 459 Mass. at 843, quoting Commonwealth v. Fenton F., 442 Mass. 31, 38 (2004). Substantively, "[o]nly 'strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent'" are manifestly unreasonable. Commonwealth v. Pillai, 445 Mass. 175, 186-187 (2005), quoting Commonwealth v. Levia, 385 Mass. 345, 353 (1982).

c. Manifest unreasonableness of counsel's strategic decisions. Deference to the motion judge's discretion notwithstanding, see Commonwealth v. Lucien, 440 Mass. 658, 669-670 (2004), we conclude for the reasons explained infra that the record before us lacks support for the judge's ruling that counsel's duty to provide constitutionally effective assistance of counsel compelled further investigation of Dr. Fox's PTSD diagnosis and the presentation of a defense based on that diagnosis.

First, the judge erred by misapplying the "manifestly unreasonable" test to the facts of this case. Reasonableness in the context of an ineffective assistance of counsel claim is an

objective standard that measures counsel's conduct against that which "lawyers of ordinary training and skill in the criminal law" would consider competent. See Pillai, 445 Mass. at 186-187. See Saferian, 366 Mass. at 96. Although our cases applying the manifestly unreasonable test have not precisely marked the limits of a trial attorney's prerogative to make strategic decisions, we have been clear that reasonableness does not demand perfection. Valentin, 470 Mass. at 190. See Strickland, 466 U.S. at 691. Nor is reasonableness informed by what hindsight may reveal as a superior or better strategy. Commonwealth v. Bernier, 359 Mass. 13, 17 (1971). Counsel may strive for perfection, but only competence or the avoidance of a "serious incompetency" is required. Walker, 443 Mass. at 225. The manifestly unreasonable test, therefore, is essentially a search for rationality in counsel's strategic decisions, taking into account all the circumstances known or that should have been known to counsel in the exercise of his duty to provide effective representation to the client and not whether counsel could have made alternative choices. Id. at 227-228. Counsel's strategic choices did not yield an outcome favorable to the defendant and, in hindsight, he could have done more or made different choices. Nonetheless, those strategic choices were rational and entirely consistent with what "lawyers of ordinary training and skill in the criminal law" would deem to be

competent.  Pillai, 445 Mass. at 186-187; Saferian, 366 Mass. at 96.

Counsel's decision to forgo further investigation of the defendant's mental state was an informed exercise of his prerogative to decide on the defense strategy.  As the judge found, counsel was aware of the options but made the strategic decision that a lack of criminal responsibility or diminished capacity defense was unlikely to succeed and that further investigation was unnecessary.  Indeed, Dr. Fox's letter of January 5, 1999, proposing these options to counsel suggested that it would have been necessary to pursue further investigation only if counsel intended to choose either defense.  Because counsel had done what was necessary to identify the defense options based on PTSD, we discern no basis to hold that he was required to exhaustively explore and identify the constellation of mental diseases later identified in the posttrial examinations.  See Commonwealth v. Candelario, 446 Mass. 847, 856-858 (2006).  Cf. Walker, 443 Mass. at 223.  Contrast Commonwealth v. Roberio, 428 Mass. 278, 280 (1998), S.C., 440 Mass. 245 (2003).

In reviewing the judge's assessment of defense counsel's strategy, we cannot blind ourselves to what counsel and other experienced trial attorneys know all too well:  the extreme difficulty in successfully defending a murder case based on a

lack of criminal responsibility defense.[10]  <u>Walker</u>, 443 Mass. at 226 & n.2 (affirming judge's finding of no ineffective assistance of counsel and noting "insanity verdicts are rare, even when . . . there is strong evidence of mental illness or bizarre human conduct").  We reiterate here the judge's references to counsel's concern that a lack of criminal responsibility defense would expose the defendant's mental condition to examination by the Commonwealth's experts.  This possibility was a powerful disincentive to pursue a defense based on a newly diagnosed condition that likely would have been undermined by the Commonwealth's expert.  Given the substantial agreement of all the trial witnesses, including the Commonwealth's witnesses, on the defendant's extreme intoxication at the time of the killing, counsel was entitled to weigh this factor more heavily in his strategic choice of a defense.  From the perspective of the hypothetical lawyer of ordinary skill and training, the choice between a defense that, in counsel's reckoning at least, would require riding "two horses," and a viable alternative defense based on the factually unassailable intoxication defense developed by counsel, would

---

[10] See, e.g., <u>Commonwealth</u> v. <u>Rosenthal</u>, 432 Mass. 124, 124-125 (2000) (defendant convicted of murder despite insanity defense where victim's organs were removed and impaled on stake).

pose little difficulty. Thus, we conclude that the judge's implicit finding that the hypothetical attorney of ordinary skills and training would perceive a "serious incompetency" in counsel's strategy to forgo an insanity defense in this case was error. See Saferian, 366 Mass. at 96.

Further, the adequacy of counsel's performance is supported by Dr. Fox's agreement to testify at trial in accordance with counsel's strategy to defend against the indictment based only on the intoxication defense.[11] Dr. Fox's participation in the trial on these terms would not have communicated to counsel the fundamental disagreement that Dr. Fox asserted at the posttrial proceedings. Rather, counsel likely would have assumed that his approach was acceptable from a medical point of view. See Commonwealth v. Gaboriault, 439 Mass. 84, 95 (2003) (rejecting defendant's claim that trial counsel was manifestly unreasonable by failing to obtain expert's opinion on criminal responsibility prior to trial where counsel obtained opinion from another expert and this expert did not volunteer such opinion until after trial). Where this is the case, we see no basis to fault counsel for elevating his concern for a viable legal defense

---

[11] Dr. Fox testified as a witness for the defense as requested by counsel notwithstanding his advice that "PTSD might be a defense worth pursuing" and that "further evaluation and testing would be useful if the defense were to be presented in court."

over a possible alternative approach likely fraught with difficulty.

The judge's assessment of counsel's performance also is a factor in our analysis.  Here, the judge found that defense counsel "is one of the most experienced and successful criminal trial attorneys in Western Massachusetts" and that, except for the strategic decision challenged by the defendant in his motion for a new trial, "counsel's performance at trial was in all other respects exemplary."  Significantly, the judge also found that counsel "took appropriate steps to investigate various defenses" and "did not ignore [the defense expert's] opinion that the defendant suffered . . . from PTSD."  Where counsel's performance is "in all other respects exemplary,"[12] we are persuaded that the measure of deference generally accorded to counsel's strategic choices was not applied in this case.

As a closing observation on this issue, we emphasize that caution is warranted in any suggestion that an attorney representing a defendant in a murder case must submit to the advice of a chosen expert.  Medical experts are not attorneys. A defendant's legal counsel is uniquely qualified to assess the

---

[12] The judge noted that "counsel vigorously argued all the evidence . . . [and that the] impairment defense appeared to have succeeded, in part, as the jury found the defendant not guilty of murder by deliberate premeditation."

nuances that attend the development of the trial strategy. See Glover, 459 Mass. at 843. Although counsel's strategic choices are always open to review, we are hesitant to endorse an analytical approach to ineffective assistance of counsel claims that permits a retained expert to support or otherwise cooperate with the defense strategy at trial and later repudiate that participation by criticizing or attacking the very role he played in the trial.

We appreciate that our appellate cases offered no clear guidance to the judge in her analysis of counsel's strategic choices; however, the cases relied upon by the judge do not require a finding that counsel's strategic decisions were manifestly unreasonable. In Walker, 443 Mass. at 223, the issue centered on counsel's decision not to investigate a defense of lack of criminal responsibility. Despite defense counsel's knowledge in that case that the defendant had years prior attempted suicide and had been discharged from the armed services for psychological reasons, id. at 225-226, the court held that because of "scant" evidence that the defendant had a history of mental health problems, counsel's decision not to investigate lack of criminal responsibility was not a manifestly unreasonable strategic choice. Id. at 227-228. The judge extrapolated from Walker a constitutional duty to explore fully the nature and extent of defendant's PTSD, apparently based on

the defendant's presentation of "strong expert opinion evidence that he suffered from mental illness at the time of the homicide." According to this logic, if counsel was excused from the obligation to investigate a lack of criminal responsibility defense where the evidence of mental disease was minimal or nonexistent, then counsel is obliged to investigate where there is strong evidence of such a condition.

The judge's reference to the "strong" posttrial evidence of the defendant's mental illness at the time of the homicide suggests an undue reliance on hindsight. As we often have cautioned, a court may not apply the benefit of hindsight in assessing counsel's strategic choices. See Strickland, 466 U.S. at 680; Glover, 459 Mass. at 843. The issue for the judge considering ineffective assistance of counsel on this ground is whether the strategic choice was reasonable at the time made. See Strickland, supra; Glover, supra. We reiterate that despite the substantive appeal of the new information, the issue should not be resolved by giving undue weight to facts unearthed during counsel's posttrial research. Rather, the issue is whether counsel was under a duty to make that same inquiry based on what he knew or should have known at the time of his trial preparation. Here, trial counsel already was aware of the implications of the defendant's PTSD diagnosis and made a

rational choice to rely on a different defense; he was under no duty to seek further expert opinion on the point.

Candelario, 446 Mass., also relied on by the judge, does not support the finding that counsel's strategic choices were manifestly unreasonable. In Candelario, supra at 853, trial counsel retained a mental health expert to evaluate the defendant before trial. Although the expert diagnosed the defendant with a frontal lobe deficit, trial counsel decided not to present an insanity defense and focused instead on winning a verdict of murder in the second degree or manslaughter. Id. at 853-854. This court affirmed the denial of a motion for a new trial where the evidence suggested that the defendant was a malingerer and his mental health issues were contrived, and concluded that trial counsel's decision was reasonable in light of the obvious "weaknesses in a defense of lack of criminal responsibility." Id. at 854, 856-857. Thus, Candelario is in accord with the view stated above that defense counsel may reject an expert's opinion of a defendant's mental condition if it is in the best interest of the trial strategy. Glover, 459 Mass. at 843.

c. Prejudice. Based on our conclusion that the judge erred in ruling that counsel's strategic choice to forgo further investigation of the defendant's mental condition and to present only an intoxication defense were manifestly unreasonable, we

need not address the issue of prejudice.  Glover, 459 Mass. at 844-845.

>                              Order granting motion for
>                               a new trial reversed.