NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-360

COMMONWEALTH

vs.

BERNADO SEMIS.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant appeals from his conviction of indecent assault and battery and from the denial of his motion for a new trial.  He argues that the trial judge erred in admitting a video deposition of the victim in lieu of live testimony because the visual format of the video did not allow the jury to view the confrontation between the victim and the defendant. Relatedly, the defendant argues that he is entitled to a new trial because defense counsel was ineffective for agreeing to the admission of the video deposition.  We affirm.

Background.  The victim is originally from Sweden and was staying with relatives in Revere during the summer of 2017.  One day that summer, the victim met the defendant by chance on the

street.  They communicated through a social media application, Snapchat, for the next two weeks, and the conversations eventually took on a sexual tone.  On the morning of July 23, 2017, the victim accepted the defendant's invitation to come to his house.

According to the victim's deposition testimony, upon her arrival, the defendant immediately led her upstairs to his bedroom.  When the victim said that she did not want to do anything sexual, the defendant responded, "Let's find out," and got on top of her.  The defendant removed the victim's shorts, kissed her neck, and tried to remove her underwear.  The victim held onto her underwear and told the defendant to stop, and he initially complied and agreed to watch a movie.  After a few minutes, however, the defendant began touching the victim's buttocks, rolled on top of her, and took off her shirt.  The victim did not resist when the defendant took off her shirt, but, when he started kissing her neck again and touching her, she told him to stop and tried to get off the bed.  The defendant grabbed the victim from behind, pulled her back on the bed, and put his fingers inside her vagina while she was telling him to stop and trying to pull his arms away.  The defendant then tried to put his penis inside the victim's vagina, but she was able to move her body to prevent him from doing so.  Eventually, the victim was able to get away and leave the house.

2

According to the defendant's testimony at trial, the victim said "no" when he first tried to kiss her, but, when he started to kiss her neck, he could "see she was kind of enjoying it." The victim helped the defendant take off her shorts and shirt, and she removed her bra herself. The victim did not resist when the defendant touched her breast and continued to kiss her neck. When the defendant touched the victim's vagina, she told him to stop, and he did. They then watched a movie for ten to twenty minutes, during which time the defendant became confused because the victim did not try to get up to put her clothes back on. Believing she had changed her mind, the defendant started kissing her again and tried to put his penis inside her vagina. The victim said "no," and he stopped. As the victim was leaving, the defendant could tell she was "kind of upset" and held her hands and apologized to her, saying that he "really like[d] her" and "[felt] bad for the situation."

Later the same morning, the defendant sent the victim several Snapchat messages, which were admitted as an exhibit at trial. In the messages the defendant told the victim that he was "sorry," it "was stupid of [him]," he had "never done it before," and he "won't do it again." He further stated, "I would have been in jail by now if I done those thing [sic] before," and appeared to acknowledge that he had held the victim down and did not listen when she told him to stop.

3

A transcript of the defendant's police interview was also admitted as an exhibit at trial. During the interview the defendant stated that the victim said "no" when he asked if she wanted to have sex, but he "start[ed] touching her" because he "wanted to see if she was going to change her mind." The defendant admitted that the victim "started getting mad" and told him to stop, but he "ke[pt] touching her." Later in the interview, the defendant admitted to touching the victim's vagina and that she told him to stop but he "didn't at first." He further stated that, when the victim "ke[pt] telling [him] to stop, that's when [he] stopped, and that's when [he] tried to put [his] penis inside."

Discussion. 1. Admission of video deposition. At the defendant's arraignment on July 28, 2017, the Commonwealth filed a motion to depose the victim pursuant to Mass. R. Crim. P. 35, 378 Mass. 906 (1979), which a judge allowed over the defendant's objection. The victim was then deposed under oath on August 7, 2017, in a courtroom with the defendant, the trial judge, and the attorneys present. Several months later, in January 2018, the Commonwealth moved to admit the video deposition in lieu of the victim's live testimony, on the ground that she was unavailable to testify at trial. While initially opposing the motion, the defendant withdrew his objection at a hearing the

following month, and the trial judge then endorsed the motion as allowed by agreement of the parties.

Per the parties' agreement, the video deposition was played for the jury at trial in September 2018.  Before it was played, the trial judge instructed the jury as follows:

> "So, they're going to play this, what we would call a video deposition.  A video deposition is the testimony of a person given under oath in court on a prior occasion in response to questions asked by either one of the attorneys."

> "You are to treat the video deposition in the same way as if the testimony had been given here in court."

> "As with all witnesses, it is for you to determine how believable and how significant that testimony is.  So, this is what we call a video deposition."

The defendant did not ask for any further instruction.

Despite his agreement below, the defendant argues on appeal that the trial judge erred in admitting the video deposition because its format did not allow the jury to see the confrontation between the victim and the defendant, as the defendant was not depicted on the screen.  The defendant further argues that the trial judge erred by not explaining to the jury who was present during the deposition.  Because these objections were not preserved, we review only to determine whether any error created a substantial risk of a miscarriage of justice. See Commonwealth v. Robinson, 480 Mass. 146, 154 (2018).  We discern no such risk.

In arguing that the video deposition was inadmissible, the defendant relies principally on Commonwealth v. Bergstrom, 402 Mass. 534, 539-540, 553 (1988), which held that allowing child victims to testify from a separate room, while the defendant and the jury watched from the courtroom by one-way video transmission, violated the defendant's right to confrontation under art. 12 of the Massachusetts Declaration of Rights. But the procedure used in Bergstrom suffered from multiple infirmities not present in this case. Most fundamentally, the defendant there was literally denied his right to face-to-face confrontation because he was not allowed to be in the room while the child victims testified. See id. at 541-548. Moreover, the child victims were not made aware that they were giving testimony against the defendant in a court of law, see id. at 540, 553, and there were multiple deficiencies with the technical aspects of the video, including distorted color and sound, loud background noises, and occasions when "the screen went blank." Id. at 549. In contrast, here, the defendant was in the room when the victim was deposed under oath, and the quality of the video, which we have viewed, did not suffer from the same technical deficiencies.

To be sure, the Bergstrom court also noted its concern that the judge and the attorneys were not shown on the screen and held that going forward, "[a]bsent compelling circumstances, a

6

jury ought to be able to view the interaction between a witness and others who are present." Bergstrom, 402 Mass. at 550. In Commonwealth v. Tufts, 405 Mass. 610, 617 (1989), the court reiterated that it is "expect[ed] that, in trials having the benefit of the Bergstrom opinion, videotapes will show all persons present in the room as the jury would perceive them in open court." At the same time, however, the court suggested in Tufts that a deficiency of this kind would not, standing alone, give rise to a constitutional violation. See id. ("It would have been better if jurors could have observed the reactions of the defendants to the child witness's testimony during the videotaping, but the fact that the defendants in this case were not visible on the videotape is not a fatal flaw to an otherwise satisfactory videotape"). The court suggested likewise in Commonwealth v. Amirault, 404 Mass. 221, 242-243 (1989) (Amirault I).[1] See also Vazquez Diaz v. Commonwealth, 487 Mass. 336, 347-349 (2021) ("Although Zoom [an Internet-based video conferencing platform] does not allow for physical, face-to-face confrontation, the technology creates a close approximation of the court room setting that can sufficiently safeguard the defendant's right to confrontation").

---

[1] We acknowledge that the trials in both Tufts and Amirault occurred prior to the court's decision in Bergstrom. See Tufts, supra at 617; Amirault I, supra at 242 n.9.

7

Ultimately, we need not reach the merits of the issue because we conclude that any deficiency in the format of the video did not give rise to a substantial risk of a miscarriage of justice.  Where, as here, a defendant has waived his claim of infringement of his right to confrontation, that "right drops out as a constitutional absolute."  Commonwealth v. Amirault, 424 Mass. 618, 651 (1997) (Amirault II).  "The defendant must then show that, taking the proceedings as a whole, the purpose and value of confrontation have not been sufficiently served and that as a result there is a substantial risk that the outcome of the trial would have been different."  Id. at 651-652.

The defendant has not met that burden.  The victim here testified under oath, in the physical presence of the defendant, and was subject to cross-examination.  The jury were able to observe the victim's demeanor as she testified, as well as the defendant's demeanor in the courtroom while the video was playing, and they knew that the defendant was present at the deposition because the victim identified him during her testimony.[2]  In these circumstances, assuming it was error not to depict the other people in the room on the screen, the error was

_____

[2] Also, after the playing of the video concluded, the trial judge instructed the jury that "the record shall reflect that the witness had identified the defendant in the context of her testimony. . . .  Bernado Semis . . . was the defendant in the deposition."

8

not sufficiently significant in the context of the trial that we are left "with a serious doubt that the [defendant's] guilt [was] fairly adjudicated." Amirault II, 424 Mass. at 647. This is especially so where the Commonwealth's evidence -- which included the defendant's inculpatory statements in his police interview and Snapchat messages to the victim -- was strong, and defense counsel made a reasonable tactical decision to agree to the admission of the video deposition, as discussed below. For these reasons we discern no substantial risk of a miscarriage of justice. See id. at 651-652.

2. Ineffective assistance of counsel. In his motion for a new trial, the defendant claimed that defense counsel was ineffective for failing to properly consult with the defendant before agreeing to the admission of the video deposition, and for not objecting to its admission based either on its format or on the Commonwealth's insufficient efforts to secure the victim's presence at trial. The motion judge, who was not the trial judge, rejected both claims without an evidentiary hearing. Exercising de novo review, see Commonwealth v. Mazza, 484 Mass. 539, 547 (2020), we reach the same result as the motion judge.

With regard to defense counsel's alleged failure to consult with the defendant, this is belied both by the trial record and by counsel's affidavit. At the hearing on the Commonwealth's

9

motion to admit the video deposition, defense counsel informed the trial judge, "I discussed this matter with my client. We decided . . . we are not going to oppose the motion." This representation is consistent with counsel's affidavit, in which he stated, "I explained to [the defendant] that in my opinion [the victim's] absence was good for him, and trying this case without live witness testimony would be good for his case. [The defendant] agreed with my decision." The defendant cites no authority to support his contention that counsel was required to do more. A defendant's right to confrontation is not on "the very short list of rights . . . that must be waived personally by a defendant and cannot be waived by his counsel." Amirault II, 424 Mass. at 651 n.23. The trial judge was thus "entitled to rely on trial counsel's representations made in the presence of his client, and to which his client did not object." Commonwealth v. Smith, 456 Mass. 476, 481 (2010). See Commonwealth v. Glacken, 451 Mass. 163, 170 (2008) (judge properly denied claim that counsel was ineffective for failing to advise defendant of right to testify, where counsel made "specific statements, . . . during the trial, that he had advised the defendant of his rights and discussed the option of testifying with both the defendant and the defendant's mother, and that the defendant chose not to testify").

With regard to defense counsel's decision not to object to the admission of the video deposition, his affidavit demonstrates that the decision was a tactical one. The defendant thus has the burden of showing that the decision "was manifestly unreasonable when made" (quotations omitted). Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015). He has not met that burden. Counsel averred in his affidavit that he chose not to oppose the Commonwealth's motion because he "did not think that a jury would convict [the defendant] in this type of case with an absent witness and without the sole accuser being physically present in court." He further averred that, after discussing the case with the prosecutor, he "believed that if [he] insisted on the witness's presence at trial then she would indeed come back for trial in the summer and that she would provide compelling testimony." This was not manifestly unreasonable. To the contrary, counsel -- who attended the deposition and conducted the cross-examination of the victim -- could reasonably have concluded that it would be better strategy to proceed with the victim's known testimony, rather than risking that she might provide more compelling testimony at trial. Indeed, in his closing argument, counsel capitalized on the victim's demeanor during the deposition, noting that she was "laughing" and "smirk[ing]," and then used that to argue, "But you know what's not funny, this man is on trial today." Counsel

11

also capitalized on the victim's statements that she had "a conflict in her mind," arguing that it supported the defense of consent because if "she doesn't know, . . . how is [the defendant] supposed to know?" We see nothing unreasonable, let alone manifestly unreasonable, about this strategy. See id. at 674-675 ("The manifestly unreasonable test . . . is essentially a search for rationality in counsel's strategic decisions, taking into account all the circumstances known or that should have been known to counsel in the exercise of his duty to provide effective representation to the client and not whether counsel could have made alternative choices").

In addition, the defendant has not shown that counsel's performance deprived him of a substantial ground of defense. Whether a defense is substantial for purposes of an ineffective assistance claim is essentially the same as whether an unpreserved trial error created a substantial risk of a miscarriage of justice. See Commonwealth v. Millien, 474 Mass. 417, 432 (2016). For the reasons discussed above, the defendant has failed to demonstrate a substantial risk of a miscarriage of justice. His argument that the case would have been dismissed if the victim did not appear at trial is not just speculative, but contradicts counsel's averment in his affidavit that, based on his discussions with the prosecutor, he believed that the

12

victim "would indeed come back for trial" and "would provide compelling testimony."

Judgment and order denying
   motion for new trial
affirmed.

By the Court (Blake, C.J.,
   Shin & Walsh, JJ.[3]),

Clerk

Entered:  June 4, 2025.

---

[3] The panelists are listed in order of seniority.

13