NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11581


COMMONWEALTH  vs.  PEDRO VALENTIN.



Suffolk.     October 6, 2014. - December 8, 2014.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Constitutional Law, Assistance of counsel.  Due Process of Law,
     Assistance of counsel.  Homicide.  Practice, Criminal,
     Assistance of counsel, Capital case, New trial.  Witness,
     Impeachment.



Indictments found and returned in the Superior Court
Department on October 23, 1991.

Following review by this court, 420 Mass. 263 (1995), a
motion for a new trial, filed on January 6, 2012, was considered
by Patrick F. Brady, J.

A request for leave to appeal was allowed by Gants, J., in
the Supreme Judicial Court for the county of Suffolk.


Dennis Shedd for the defendant.
Paul B. Linn, Assistant District Attorney, for the
Commonwealth.


CORDY, J.  The defendant's conviction of murder in the

first degree was affirmed by this court in 1995.  See

Commonwealth v. Valentin, 420 Mass. 263 (1995). In 2012, he filed a motion for a new trial which was denied. The case is now before us pursuant to an order of a single justice of the county court allowing, in part, the defendant's application for leave to appeal from that denial under G. L. c. 278, § 33E.

We conclude that trial counsel did not render ineffective assistance in failing to impeach a witness as to one of his statements, where counsel's decision was not manifestly unreasonable and, in any event, did not so impact the outcome of the trial as to create a substantial risk of a miscarriage of justice. We also conclude that the substitution of trial counsel's partner to stand in for her during jury deliberations was not one of structural error warranting a new trial absent a showing of prejudice. Further, considering the claim as one of ineffective assistance of counsel, we conclude that the defendant did not receive constitutionally deficient assistance or suffer any appreciable prejudice as a result of the substitution. Accordingly, the defendant's motion for new trial was properly denied.

Background. In October, 1991, the defendant was indicted on charges of murder in the first degree, G. L. c. 265, § 1, for the killing of Timothy Bond in July, 1991, and for assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b).

1. <u>Evidence at trial</u>. The facts of this case are set forth in our decision in <u>Valentin</u>, 420 Mass. at 265-266. In summary, in July, 1991, Timothy Bond stole cocaine from Angel Ruidiaz, who was selling drugs on behalf of the defendant's brother, Simon. Though Ruidiaz paid Simon for the stolen drugs, Simon stated that he was "still going to get" Bond.

Later that month, Bond went to Metcalf Court in the Jamaica Plain section of Boston with his friend Kenneth Stokes and joined a group of others who were sitting on a wall, talking and drinking. Shortly thereafter, Simon and the defendant approached Bond from behind and Simon shot Bond in the back of the head. Bond then fell to the ground and Simon shot him once more in the head. Stokes testified that the defendant subsequently stomped on the victim's head, saying, "Die, motherfucker," and then fled with Simon. While running away, the defendant said to Simon, "Man, put the gun away, the police are coming."

At trial, the defendant's primary defense was alibi. He called three witnesses to testify that he was elsewhere playing dominoes at the time of the shooting. The Commonwealth called four witnesses (including Stokes) who were present at the shooting. Each of them testified that the defendant "kicked" or "stomped" on Bond's head after Simon fired the second shot. Only Stokes testified that the defendant said, "Die,

motherfucker," when he did so. The defense cast doubt on the credibility of these witnesses, two of whom acknowledged that when they spoke to the police shortly after the incident, they did not say that the defendant had stomped on Bond. Stokes was extensively cross-examined but was not questioned about his initial failure to tell the police about the defendant's "Die, motherfucker" statement.

2. <u>Role of trial counsel's law partner</u>. On the second day of jury deliberations, trial counsel, Frances Robinson, asked permission from the judge to have her law partner stand in for her. Her partner had not done any work on the case, but had discussed it with Robinson. The judge granted this request. The judge did not seek the defendant's consent to the substitution on the record.[1]

While substitute counsel was standing in, the jury asked to be reinstructed on both joint venture and premeditation. With substitute counsel present, the judge provided supplemental instructions on both topics. After the judge provided these reinstructions, substitute counsel asked to preserve any objections that Robinson had made previously to the joint venture and premeditation instructions in the main jury charge. The judge assured substitute counsel that he was not waiving any

---

[1] In her affidavit filed in connection with the new trial motion, trial counsel stated that she discussed the substitution of counsel with the defendant.

of these objections.  Later that afternoon the jury found the defendant guilty as a joint venturer in premeditated murder, and not guilty of assault and battery by means of a dangerous weapon.

In January, 2012, the defendant filed a motion for a new trial, which was denied without a hearing on February 6, 2013. Later that month, the defendant filed a petition for leave to appeal under G. L. c. 278, § 33E, and on August 1, 2013, a single justice allowed the petition as to two of the presented issues:  first, whether the defendant's trial counsel rendered ineffective assistance by failing to impeach Stokes's testimony about the defendant's statement made at the scene of the murder; and second, whether the defendant was deprived of counsel when his trial counsel's law partner stood in during jury deliberations.

Discussion.  As this case comes to us on appeal from the denial of a motion for a new trial and alleges errors that are grounded in the record that was before this court in its plenary review, we review it under the standard of "substantial risk of a miscarriage of justice."  Commonwealth v. Randolph, 438 Mass. 290, 297 (2002).  A substantial risk of a miscarriage of justice exists when we have a "serious doubt whether the result of the trial might have been different had the error not been made." Commonwealth v. Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass.

72 (2005), quoting Commonwealth v. LeFave, 430 Mass. 169, 174 (1999). "Errors of this magnitude are extraordinary events and relief is seldom granted. . . . Such errors are particularly unlikely where, as here, the defendant's conviction . . . has undergone the exacting scrutiny of plenary review under § 33E" (citation omitted). Randolph, supra at 297. However, because the single justice permitted the defendant leave to appeal from the denial of his motion for a new trial, we review the issues raised.

1. Impeachment of Stokes. We turn first to whether the defendant was denied effective assistance of counsel as a result of trial counsel not impeaching Stokes's testimony attributing the statement, "Die, motherfucker," to the defendant. This testimony had obvious relevance to the defendant's shared intent with his brother in the murder of Bond. While at trial Stokes testified that the defendant had said this, he had not told this to the police who interviewed him immediately after the shooting, saying then only that the perpetrators "ran away."

In Strickland v. Washington, 466 U.S. 668, 686 (1984), quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970), the United States Supreme Court recognized that the right to counsel in a criminal case is the right to "effective assistance of counsel." To establish a claim of constitutional ineffectiveness, the defendant must establish that his

attorney's performance fell "below an objective standard of reasonableness" such that there is a "probability sufficient to undermine confidence in the outcome."  Id. at 688, 694.  The court emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "the distorting effects of hindsight" must be avoided in evaluating a claim made after a trial in which attorney's defense strategy was proved unsuccessful.  Id. at 689.

When evaluating a claim of ineffective assistance of counsel arising under both the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution, we ask whether there has been a "serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer -- and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence."  Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  See Commonwealth v. Sylvain, 466 Mass. 422, 437 (2013); Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006).  Essentially, "[t]he defendant must demonstrate that 'better work might have accomplished something material for the defense.'"  Acevedo, 446 Mass. at 442, quoting Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977).  Moreover, this court has generally

shown deference to the strategic decisions made by attorneys, noting that "[a] strategic or tactical decision by counsel will not be considered ineffective assistance unless that decision was 'manifestly unreasonable' when made."  Acevedo, supra at 442, quoting Commonwealth v. Adams, 374 Mass. 722, 728 (1978). See Commonwealth v. Fisher, 433 Mass. 340, 354 (2001); Commonwealth v. White, 409 Mass. 266, 272 (1991) ("In cases where tactical or strategic decisions of the defendant's counsel are at issue, we conduct our review with some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful").

Although the failure to pursue an "obviously powerful form of impeachment" can theoretically rise to the level of unreasonableness that would constitute ineffective assistance, we have repeatedly stated that, generally, the failure to impeach a witness does not, on its own, constitute ineffective assistance.  Fisher, 433 Mass. at 357.  See Commonwealth v. Jenkins, 458 Mass. 791, 805-808 (2011), citing Commonwealth v. Bart B., 424 Mass. 911, 916 (1997).  Ultimately, this is because the "[i]mpeachment of a witness is, by its very nature, fraught with a host of strategic considerations to which we will, even on § 33E review, still show deference" and "it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion."  Fisher, supra.  Here, we

cannot say that trial counsel's decision not to impeach Stokes on the statement in question was "manifestly unreasonable" such that her assistance was ineffective (citation omitted). Acevedo, 446 Mass. at 442.

In an affidavit submitted in connection with the defendant's motion for a new trial, trial counsel explains: "I did cross examine . . . Stokes extensively on his not having made statements consistent with the testimony he gave at trial. In reviewing the transcript, I believe that I did not cross examine him specifically on not having said '[D]ie, motherfucker' because I had gotten the point across that his statement was not the same. I do not believe that further cross examination on the statement . . . would have helped the defense because I believe it would have highlighted it." Having focused considerable attention on proving that the defendant was not Simon's companion at the incident in pursuit of an alibi defense, and having impeached the credibility of Stokes based on various differences between his original statement to police and his testimony, trial counsel's decision not to impeach Stokes on whether he heard the defendant make this particular statement, in order to avoid highlighting it, was not manifestly unreasonable.

However, the defendant notes that trial counsel did end up repeating the "Die, motherfucker" statement in her closing in an

attempt to discredit it, and did not discuss alibi until the end of her argument.  The manner in which the trial ultimately played out after Stokes's cross-examination is of little weight in our analysis of whether it was "manifestly unreasonable" for counsel to have cross-examined Stokes the way she did at the time of his testimony.  This is particularly so where she conducted a thorough impeachment of Stokes based on a series of inconsistent statements, thereby casting doubt on the veracity of his over-all testimony.

Even if it was unreasonable for counsel not to impeach Stokes's specific statement, we cannot say that this error led to a substantial risk of a miscarriage of justice.  There is no question that the "Die, motherfucker" statement was evidence that went directly to the question whether the defendant had the necessary mental state to support a finding of guilt as a joint venturer.  The defendant cites to Commonwealth v. Reaves, 434 Mass. 383, 391-392 (2001), arguing that a conviction of murder in the first degree requires a finding that he had to share the mental state of "intent to kill and premeditation" with the principal.  He further contends that if Stokes's statement had been more thoroughly discredited through additional impeachment, the Commonwealth could not have convinced the jury that the defendant had the requisite mental state to support his conviction.  We disagree.

In Reaves, this court stated that the "jury may infer the requisite mental state [for a joint venturer] from the defendant's knowledge of the circumstances and subsequent participation in the offense." Id. at 392, quoting Commonwealth v. Longo, 402 Mass. 482, 486 (1988).[2] Accordingly, in the instant case, even though the specific statement was not impeached, there was substantial additional evidence from which the jury could have inferred that the defendant shared Simon's intent to kill the victim, including evidence that the defendant (1) knew that Simon was angry at the victim over a drug deal gone bad; (2) knew that Simon had a gun; (3) appeared to be acting as a lookout before the crime; (4) arrived with and stood with the shooter during the commission of the crime; and (5) fled with and urged the shooter to conceal the gun.[3]

The defendant points to several cases in which this court did conclude that failure to pursue an avenue of witness impeachment could constitute ineffective assistance. However, each of these cases is appreciably different from the instant case. For example, in Commonwealth v. Ly, 454 Mass. 223, 229-

_____

[2] We also noted this point in our 1995 decision upholding the defendant's conviction. See Commonwealth v. Valentin, 420 Mass. 263, 266-267 (1995).

[3] The jury also heard the testimony of three witnesses other than Stokes that the defendant kicked or stomped on the victim's head as he fled the scene with Simon, although in his testimony the medical examiner did not mention any injuries to the victim consistent with being kicked or stomped on the head.

231 (2009), the defendant's primary defense to a charge of indecent assault and battery was that the complainant had called him multiple times after having sexual relations with him, saying that she wanted to marry and move away with him, and that she did not bring a complaint until after he refused. The attorney in Ly failed to summon these crucially relevant telephone records and therefore was unable to impeach the complainant when she denied ever calling the defendant after the incident. Id. at 229. Accordingly, this court found that the failure of counsel to impeach the complainant using telephone records was ineffective assistance, noting that the "centrality of the telephone calls to the only issue in the case is apparent, and should have been apparent to trial counsel before the case began." Id. at 230. See Commonwealth v. Nwachukwu, 65 Mass. App. Ct. 112, 116-117 (2005) (ineffective assistance of counsel where attorney failed to obtain records that contradicted complainant's testimony and therefore failed to impeach her though her testimony and credibility went to heart of case).

Unlike in Ly where there was only one disputed issue that depended completely on the complainant's credibility, there were several disputed issues here other than Stokes's credibility, and each could have been established in a variety of ways. Whether the defendant actually made the statement in question

was not the linchpin of the defense.  Defense counsel presented several alibi witnesses, who, if believed, would have rendered anything that Stokes said about the shooting incident irrelevant.  Moreover, defense counsel did attempt to impeach Stokes's credibility and the credibility of the other eyewitnesses with prior inconsistent statements about what occurred.  Even if the jury did not believe the alibi witnesses, they still had reason to doubt the testimony of the Commonwealth's witnesses as to what the defendant did and said.  Where this was not a single issue case like Ly, the failure to impeach here is not so obviously unreasonable.

The defendant also cites to Commonwealth v. Sena, 429 Mass. 590 (1999), S.C., 441 Mass. 822 (2004).  In Sena, although other witnesses placed the defendant at the scene of the crime, only one saw the defendant shoot the victim.  Id. at 592.  Prior to trial, the witness had made a statement to a defense investigator that contradicted his trial testimony.  Id. at 591-593.  After already having been admonished twice by the judge to comply with a pretrial discovery order, defense counsel gave prosecutors a report of the eyewitness's earlier statement on the final day of trial.  Id. at 592-593.  Given the judge's previous warnings to comply with the discovery order and defense counsel's extremely untimely provision of the report, the judge did not permit defense counsel to question the investigator

regarding the report and defense counsel was unable to use it to impeach the eyewitness himself. Id. at 593-594. Ultimately, this court ordered a new trial, as, given counsel's missteps, we could not be "substantially confident that, if the error had not been made, the jury verdict would have been the same," id. at 595, quoting Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998), as the preclusion of the reports "had a tangible effect on [the defendant's] defense." Id.

Sena is readily distinguishable from the present case. In that case, the attorney's error was not merely a strategic decision. The ultimate prejudice to the defendant arose from his attorney's failure to comply with a discovery order. As a consequence, defense counsel was unable to use the investigator's report to cross-examine the eyewitness or to examine the investigator. Id. at 594-595. Although the eyewitness had already been impeached and some of the facts from the report otherwise had been admitted in evidence, the addition of the investigator's report would have permitted the jury to completely reject the sole eyewitness's testimony rather than just call it into question. See id. at 595.

Finally, the defendant analogizes his case to a series of United States Supreme Court cases under the confrontation clause of the Sixth Amendment in which a judge's refusal to allow impeachment of a witness was sufficiently prejudicial to require

a new trial. However, these cases are not analogous to the defendant's case for two reasons. First, the standard of review of confrontation errors is considerably stricter than the ineffectiveness standard applicable to the instant case. See, e.g., Olden v. Kentucky, 488 U.S. 227, 232 (1988), quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986) ("whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt"); Commonwealth v. Vardinski, 438 Mass. 444, 450 (2003) ("whether reversal is warranted because the error was not harmless beyond a reasonable doubt"). Second, those cases deal with a judicial decision to disallow impeachment evidence, rather than a defense counsel's strategic decision not to impeach a witness or to use a particular method of impeachment after tactical consideration.

Given that this case involved multiple avenues of defense, more than one key witness, and general impeachment of all of the Commonwealth's witnesses based on inconsistent statements, defense counsel's strategic decision not to impeach Stokes's particular statement was not "manifestly unreasonable" such that her assistance was ineffective. Moreover, even though defense counsel did not pursue an otherwise available avenue of impeachment, and although in hindsight that may not appear to have been wise, we cannot conclude that this decision so

impacted the outcome of the case that there was a "substantial risk of a miscarriage of justice."

2. Substitution of trial counsel. The United States Supreme Court has found that a criminal trial is inherently unfair if the defendant is denied counsel at a "critical stage" of the proceedings, meaning that counsel is either totally absent or is prevented from assisting the accused at that time. United States v. Cronic, 466 U.S. 648, 659 n.25 (1984). Such denials of counsel constitute structural error and require no showing of prejudice to warrant reversal. Id. at 658-660, 662.

In Massachusetts, jury deliberations have been found to be a critical stage of the proceedings, at least when the jury communicates a request that is of legal significance. Commonwealth v. Bacigalupo, 49 Mass. App. Ct. 629, 632 (2000). See Commonwealth v. Floyd P., 415 Mass. 826, 833-834 (1993). The assistance of counsel in these circumstances requires the judge, before responding to the jury's communication, to consult with counsel as to an appropriate response.

Here, the jury requested reinstruction on joint venture and premeditation, two legal issues of significance to the case, and the judge responded to the jury's questions in the absence of the defendant's original counsel. Therefore, the issue before us clearly arose during a critical stage of the proceedings, such that if the defendant was actually or constructively denied

counsel, he would have a right to a new trial without a showing of prejudice.  See, e.g., Curtis v. Duval, 124 F.3d 1, 4-5 (1st Cir. 1997) (automatic reversal required when judge gives jury instruction without consulting with and in absence of defendant and counsel).

a.  Structural error.  The defendant argues that even though he had counsel during every stage of jury deliberations, he was constructively denied counsel because the judge did not obtain his informed consent to the substitution of counsel and substitute counsel was unfamiliar with the case.  Further, even if the Sixth Amendment does not require a finding of structural error here, the defendant argues that art. 12 is given a broader reading than the Sixth Amendment.

The Commonwealth concedes that jury deliberations are a critical stage of the proceedings, such that denial of counsel would warrant automatic reversal.  However, the Commonwealth argues that because the defendant did not raise the issue of informed consent to the substitution of counsel in his motion for a new trial, the single justice was prevented from determining whether the issue was new and substantial as required by G. L. c. 278, § 33E.  Accordingly, the Commonwealth argues that the issue is waived.[4]

---

[4] No challenge to the substitution of counsel, or the lack of consent to the same, was raised in the direct appeal.

On the merits of the defendant's claim, the Commonwealth argues that he was not constructively denied counsel because substitute counsel, a licensed lawyer, was present and competent to represent him at that stage. The Commonwealth additionally argues that even though art. 12 may afford greater protections than the Sixth Amendment, the defendant is still required to show that the substitution of counsel resulted in the forfeiture of a substantial defense, which the defendant has not shown.

Trial counsel's affidavit indicates that the defendant least knew about the attorney substitution, but it is apparent that the judge did not obtain the defendant's consent on the record before permitting it. The defendant has not cited to any case in which a court has held that the absence of informed consent to substitute counsel mandates reversal, and we decline to adopt such an absolute rule. We are not persuaded that the substitution of counsel during jury deliberations without the defendant's consent constitutes a per se structural error. Structural errors are ones that render the "adversary process itself presumptively unreliable" or that constitute "constitutional error[s] of the first magnitude" that simply cannot be cured even if the error was ultimately harmless. Cronic, 466 U.S. at 659, quoting Davis v. Alaska, 415 U.S. 308, 318 (1974). This court also has held that structural errors are "fundamental defects" that "necessarily render[] a criminal

trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence," and accordingly, "occur rarely."  Commonwealth v. Petetabella, 459 Mass. 177, 183 (2011), quoting Commonwealth v. Hampton, 457 Mass. 152, 163 (2010).

We cannot say that the substitution of counsel in this case amounted to such a high order of unfairness that our confidence in the adversary process itself is in doubt or that there was a substantial risk of a miscarriage of justice.  While the court in Cronic acknowledged that "[c]ircumstances of [this] magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial," 466 U.S. at 659-660, constructive denials of counsel which meet that order of magnitude are rare.  In Cronic itself, the Court declined to find structural error, even where a defendant was facing a twenty-five year sentence for mail fraud and was appointed a young attorney with a real estate practice who had only twenty-five days to prepare, while the government had had four and one-half years to investigate the case and review thousands of documents.  466 U.S. at 649, 666.  Contrast Powell v. Alabama, 287 U.S. 45, 58 (1932) (structural error

where defendants charged with atrocious crime and "put in peril of their lives within a few moments after counsel for the first time charged with any degree of responsibility began to represent them").

The defendant notes several cases in other jurisdictions in which convictions were overturned because an unprepared counsel was appointed at the last minute for the duration of an entire trial. See Hunt v. Mitchell, 261 F.3d 575, 582-583, 585 (6th Cir. 2001); United States v. Koplin, 227 F.2d 80, 86 (7th Cir. 1955); In re Shawn P., 172 Md. App. 569, 587-588 (2007). Such cases present a far different circumstance from the one before us. Each involves representation by an unprepared attorney for an entire trial, such that defense counsel could not meaningfully function as an effective adversary. Ultimately, "the 'appropriate [Sixth Amendment] inquiry focuses on the adversary[y] process, not on the accused's relationship with his lawyer.'" Commonwealth v. Britto, 433 Mass. 596, 607 (2001), quoting Commonwealth v. Tuitt, 393 Mass. 801, 806-807 (1985).

The defendant's argument that art. 12 should provide relief in these circumstances is also meritless. He cites no examples of how a broader reading of art. 12 would help him in this analysis, other than that this court has found denials of the right to counsel amounting to structural error specifically where a trial attorney has a conflict of interest or where the

trial judge has not followed strict protocols for forfeiting the right to counsel.  See, e.g., Commonwealth v. Hodge, 386 Mass. 165, 169-170 (1982) (where counsel has genuine conflict of interest, no prejudice required to warrant new trial); Commonwealth v. Means, 454 Mass. 81, 89-97 (2009) (strict protocols apply before defendant can be found to have waived or forfeited his right to counsel).  Both of these cases are consistent with an understanding that constructive denials of counsel rising to a level of structural error occur only where the defendant essentially is denied the assistance of any qualified attorney who could theoretically represent him in a way that does not undermine our trust in the adversary system.

Here, substitute counsel was not fundamentally incapable of representing the defendant's interests for the brief period of his representation to warrant a finding of structural error. And, as found by the motion judge, substitute counsel did actively render some assistance to the defendant by ensuring that objections to the instructions made earlier by trial counsel were preserved.  Any error in permitting substitute counsel to stand in for trial counsel was not structural and therefore requires a showing of prejudice in order to justify a new trial.[5]  No such showing has been made.

------

[5] In the future, it would be better practice for the judge to engage in a colloquy with the defendant to ensure that he has

b.  Effectiveness of counsel.  Even if the defendant was not constructively denied counsel outright, he still has a right to effective assistance of counsel.  Accordingly, we look to whether the conduct fell within a range of professionally reasonable judgments based on the professional norms as they existed at the time.  Strickland, 466 U.S. at 688.  The measure we use in assessing attorney conduct is an objective one.  See Commonwealth v. Hardy, 464 Mass. 660, 665 (2013), cert. denied, 134 S. Ct. 248 (2013); Saferian, 366 Mass. at 96.  Unlike with a structural error, if substitute counsel's performance was substandard, the defendant must still show prejudice and that better work "might have accomplished something material for the defense."  Acevedo, 446 Mass. at 442, quoting Satterfield, 373 Mass. at 115.

Here, substitute counsel represented the defendant for only a portion of the jury's deliberations, during which time the judge provided reinstruction on two legal issues on which he had previously instructed the jury in the presence of trial counsel. The defendant claims error as to the "joint venture" reinstruction, noting that while trial counsel made sure the judge instructed that both "guilty" and "not guilty" verdicts were options when considering whether the defendant should be

been properly informed about and has no objection to the substitution before allowing it.

convicted of this charge, the judge did not include the option of "not guilty" when reinstructing on joint venture and substitute counsel did not object. This omission on the part of substitute counsel arguably is not even error, because the jury were previously instructed both generally and in the context of joint venture that they could find the defendant not guilty and had to if the Commonwealth failed to prove any element of murder beyond a reasonable doubt.

Further, it is not clear that the judge would have repeated the full instruction he had given previously even if substitute counsel had objected. The jury's question was specifically, "Your Honor, could you please refresh [us] on the laws on the elements of the joint venture in detail." The judge could have interpreted this question to be fully answered by only walking through the various elements of joint venture. Therefore, we cannot say that substitute counsel's failure to object likely influenced the jury's verdict in any significant way.

The defendant also claims error as to the judge's supplemental premeditation instruction. The judge intermingled a definition of malice generally within his explanation of premeditated malice and included a statement, only in the supplemental premeditation instruction, that malice generally could be "a specific intent to inflict grievous bodily harm." Thus, the jury could have possibly understood premeditated

malice to include intent to inflict grievous bodily harm, so long as the "deliberation and reflection" elements of premeditation were met.[6]

In support of his argument, the defendant cites Commonwealth v. Johnson, 435 Mass. 113, 119, 121-122 (2001), in which this court held that a premeditation instruction that included all three prongs of malice created a substantial likelihood of miscarriage of justice.  However, Johnson was decided long after the defendant's trial and substitute counsel could not possibly have been aware of it at that time.  As noted by the Commonwealth, this court did not expressly state until 1998 that jury instructions should make clear that "murder in the first degree by reason of deliberate premeditation relates only to the first prong of malice," a specific intent to kill. Commonwealth v. Diaz, 426 Mass. 548, 553 (1998).  Still, substitute counsel could have argued that the supplemental instruction was confusing.  Accordingly, we consider whether not pursuing this argument was "manifestly unreasonable" in a way that gives rise to a "substantial risk of a miscarriage of justice" (citation omitted).  Acevedo, 446 Mass. at 442.

---

[6] The Commonwealth claims that the judge included a reference to malice as grievous bodily harm in the original jury instructions as well and trial counsel did not object.  Although this is accurate, the judge also clearly delineated malice generally, as it would apply to murder in the second degree, from premeditated murder.

Given that this court had yet to articulate expressly that jury instructions on deliberate premeditation clearly should relate only to the first prong of malice, it is an unreasonably high standard to expect "an ordinary fallible lawyer" to have anticipated this future holding and objected to the jury instructions. See id., quoting Saferian, 366 Mass. at 96. Substitute counsel would not have had a clear statement of law on which to rely in arguing that the judge erred in mentioning grievous bodily harm in a way that could have been interpreted to apply to premeditated murder.

Even if this was error on substitute counsel's part, we cannot say that there was a substantial risk of a miscarriage of justice. In a postappeal, collateral attack that raises an issue regarding jury instructions, we "consider whether 'a reasonable juror could have used the instruction incorrectly,'" in light of "the instruction as a whole and in the context of the trial." Commonwealth v. Gagnon, 430 Mass. 348, 349-350 (1999), quoting Commonwealth v. Smith, 427 Mass. 245, 249 (1998).

Considering the instructions in this case in light of how the jury would have perceived them and in the context of the entire trial, there was no substantial risk of a miscarriage of justice here. First, this was a supplemental instruction and the judge's original instructions on general malice and

premeditation clearly delineated the two concepts. Second, although the judge did not distinguish the two concepts as clearly in the supplemental instruction, he did make a distinction between the two. He described "malice aforethought, just plain malice aforethought," and then reiterated that this could be an intent to kill without justification or an intent to inflict grievous bodily harm. Then, he noted that "deliberately premeditated malice aforethought is something more than that," and proceeded to discuss premeditation at greater length. Moreover, in his premeditation discussion, he repeatedly described premeditated malice as "something more than the instant formation of the purpose to take life," it requires a "plan or purpose to take life," or a settled "determination to kill."

Thus, even though the judge's supplemental instructions could have more clearly distinguished between general malice and premeditation, the jury would have understood from the language of the judge's supplemental instruction that deliberate premeditation relates to an intent to kill and not an intent to inflict grievous bodily harm. Although the defendant surmises that trial counsel might have objected to portions of the supplemental instructions given her detailed familiarity with the case, the fact that a certain attorney might have done a better job on the defendant's behalf is not the standard for

ineffective assistance of counsel.  Even though he could have made certain objections regarding the supplemental instructions, substitute counsel's actions did not fall below what we would expect from an ordinary fallible lawyer, and the defendant was not significantly prejudiced by substitute counsel's performance such that he is entitled to a new trial.

Conclusion.  The order denying the defendant's motion for a new trial is affirmed.

So ordered.