NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-237

COMMONWEALTH

vs.

DEMETRIUS GOSHEN.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant, Demetrius Goshen, was indicted for murder in the first degree and, after a jury trial in the Superior Court, convicted of the lesser included offense of voluntary manslaughter.  The defendant was eighteen years old at the time he fatally stabbed the victim, Dwayne Borges.  The defendant appealed, and while his appeal was pending, he filed motions for a new trial, or in the alternative, new sentencing, based primarily on claims of ineffective assistance of counsel. Following an evidentiary hearing, the motion judge, who was not the trial judge,[1] denied the defendant's motion for a new trial, but granted his request for the alternative relief of a new sentencing hearing.  Before us is the defendant's direct appeal,

_____

[1] The trial judge had retired.

his appeal from the order denying his new trial motion, and the Commonwealth's appeal from the order allowing the defendant a new sentencing hearing.  We affirm.

Background.  We summarize the facts the jury could have found, reserving certain facts for later discussion.

Shortly before noon on October 8, 2014, the defendant and three friends -- Latroy Hairston, Adrian Garcia, and Jared Frye -- were at a Cumberland Farms store in Wareham.  The four young men had grown up together and were members of "Mpyre," a music group that identified its members through the carrying of bandanas, referred to as "flags."  All four youths carried knives on a regular basis, and each had a knife with him on October 8 at the Cumberland Farms.

As the defendant stood in the store's doorway, the victim and his girlfriend drove into its parking lot.  The victim went into the store.  As the victim passed Garcia, he pulled the "flag" from Garcia's pocket.  Garcia responded by "tackl[ing]" the victim, who put Garcia in a headlock.  Frye, Hairston, and finally, the defendant joined in the fight and pushed the victim into the corner of the store.[2]  The victim was stabbed eight times and died later that day.

---

[2] Much of this altercation was recorded on the store's video surveillance system.

The defendant and his companions fled but were soon apprehended by the police. Law enforcement officers discovered several items they believed to have been discarded by the defendant and his friends as they fled, including a large kitchen knife with a blue handle and a knife sheath. Garcia had a knife in his possession when he was apprehended by the police; a third knife was found in the footwell of Frye's seat in the police cruiser. The blue-handled kitchen knife (knife) later tested positive for blood; the DNA profile obtained from the blood sample matched that of the victim.

The defendant was indicted for murder by a Plymouth County grand jury in January 2015, and his three friends were each charged with armed assault with intent to murder.

At trial, the defendant neither testified nor presented any evidence. Through argument and cross-examination, he contended that the Commonwealth had failed to prove that he inflicted "any fatal wound." Defense counsel argued that the surveillance video showed the defendant was unarmed, was the last to join in the altercation, and engaged in a fleeting struggle of a duration inadequate to inflict the victim's wounds. He further argued that the alleged murder weapon belonged to Hairston, who negotiated a deal with the prosecution to pin the killing on the defendant. As noted, the jury returned a verdict of voluntary manslaughter.

3

At sentencing, approximately one month after the jury's verdict, defense counsel argued for a five-to-seven-year sentence and highlighted mitigating circumstances including the fact that "[the defendant] was 18 years of age at the time [of the crime]." The judge responded, "I respect what you say. You did an excellent job representing your client." After considering the "senseless" nature of the killing, the use of the knife, and the serious wounds, the judge concluded, "I don't think there are mitigating circumstances," and sentenced the defendant to eighteen to twenty years.

Discussion. 1. Defendant's direct appeal. a. Cooperation agreements. At or near the time of the grand jury presentation, Hairston, Garcia, and Frye signed plea and cooperation agreements with the Commonwealth.[3] At trial, Hairston and Garcia testified for the Commonwealth. Their cooperation agreements set forth in several places each witness's obligation to testify truthfully before the grand jury and at trial. The defendant did not object to the admission into evidence of the two cooperation agreements, but later argued that references in them to "truthful" testimony amounted to improper vouching and should be redacted. The judge

---

[3] Each of them agreed to plead guilty and testify on behalf of the prosecution in exchange for, among other concessions, a reduction in the charges and the Commonwealth's recommendations of favorable dispositions.

4

disagreed, concluding that there was no vouching, and because he had provided the jury with a limiting instruction at the time the agreements were introduced, "[the jury] should see the entire [cooperation agreement]." Additionally, on direct examination, the prosecutor elicited from each codefendant a brief explanation of his understanding of his agreement. Garcia said, "That I am to cooperate with the Commonwealth and testify." Hairston, however, testified that he understood his cooperation agreement to require that "I tell the truth." The defendant did not object to any of this testimony.

The defendant argues, and the Commonwealth correctly recognizes, that the better practice would have been for the judge to redact the agreements as requested by the defendant. Likewise, Hairston should not have been permitted to testify on direct examination that his agreement with the government required him to "tell the truth" about the events surrounding the stabbing. See Commonwealth v. Ciampa, 406 Mass. 257, 262, 263 (1989). Cf. Commonwealth v. Charles, 428 Mass. 672, 680-681 (1999). Treating both objections as preserved,[4] we consider whether the error was prejudicial. See Commonwealth v. Cheng Sun, 490 Mass. 196, 219 (2022).

---

[4] Despite the unpreserved nature of some of these objections, we apply the same standard for ease of analysis.

Before admitting the first of the two cooperation agreements, the judge gave the "specific[] and forceful[]" instructions required under Ciampa, "tell[ing] the jury to study the witness's credibility with particular care," and he repeated those instructions in his final jury charge. Ciampa, 406 Mass. at 266. See Commonwealth v. Correia, 65 Mass. App. Ct. 597, 602 (2006). In doing so, the judge explicitly instructed the jury that the Commonwealth did not know whether the witnesses were testifying truthfully. These instructions cured any prejudice created either by Hairston's testimony about his obligation to testify truthfully or the failure to redact the cooperation agreements.[5] See Commonwealth v. Rosario, 460 Mass. 181, 189 (2011).

b. Autopsy photographs. i. Substitute medical examiner's testimony. By the time of trial, the medical examiner who had conducted the autopsy, Dr. Renee Robinson, was not available. The Commonwealth therefore called another medical examiner, Dr. Anand Shah, as a substitute witness.

On direct examination, the prosecutor properly elicited Dr. Shah's opinion about the cause of the victim's death, as well as opinions derived from Dr. Shah's review of the autopsy

_____

[5] The verdict further supports our conclusion that any error was not prejudicial. Ultimately, the jury convicted the defendant of manslaughter, not murder. See Commonwealth v. Stephens, 44 Mass. App. Ct. 940, 942 (1998).

6

photographs.  See Commonwealth v. Leiva, 484 Mass. 766, 792-793 (2020).  The prosecutor misstepped, however, by eliciting Dr. Shah's testimony about details gathered from the report of the medical examiner who performed the autopsy, Dr. Robinson, which was not in evidence.  "A substitute medical examiner may not . . . testify to facts in the underlying autopsy report where that report has not been admitted."  Commonwealth v. Reavis, 465 Mass. 875, 883 (2013).  Dr. Shah's testimony about these facts violated the defendant's right to confront Dr. Robinson and was thus inadmissible.  See Commonwealth v. Greineder, 464 Mass. 580, 584, cert. denied 571 U.S. 865 (2013); Commonwealth v. Durand, 457 Mass. 574, 584-585 (2010).

Even treating the objection as preserved, however,[6] we conclude that the impact of the error was minimal.  The testimony was cumulative of other properly admitted evidence -- the autopsy photographs, Dr. Shah's opinion that wounds nos. 3 and 7 caused the defendant's death, Dr. Shah's testimony about the wound sizes, and Dr. Shah's opinion about "the characteristics of the object probably used to inflict the type of injury observed."  Commonwealth v. Emeny, 463 Mass. 138, 146

---

[6] Until prompted by the judge, the defendant did not object to Dr. Shah's testifying to the facts underlying his own opinion.

7

(2012), quoting Commonwealth v. Avila, 454 Mass. 744, 761 (2009).[7]

ii. Authentication. At trial, the judge permitted the Commonwealth to introduce eight photographs of the victim's autopsy into evidence without objection. Three of the photographs now challenged by the defendant, exhibit nos. 36, 38, and 39, were properly admitted through Dr. Bedabrata Sarkar, the surgeon who treated the victim on the afternoon of the stabbing. Dr. Sarkar properly authenticated those photographs by testifying about his observations of the victim during surgery; he confirmed that each photograph was a fair and accurate representation of what he saw. See Commonwealth v. Housen, 458 Mass. 702, 712 (2011); Mass. G. Evid. § 901 (a) (2023).

We reach a different conclusion as to the remaining five photographs (exhibit nos. 75 through 79) admitted through Dr. Shah, the physician whom we have noted was called by the Commonwealth to testify as a substitute medical examiner. See Reavis, 465 Mass. at 883. Dr. Shah had not seen the victim's

---

[7] The defendant's passing reference in his brief to the erroneous introduction of the victim's death certificate through the substitute medical examiner is not supported by any record citations and does not rise to the level of appellate argument. We do not address it further.

8

body when the photographs were taken or, indeed, at any time,[8] and the Commonwealth did not demonstrate that Dr. Shah was competent to testify "that the [photographs] [were] what the proponent claim[ed] [they] [were]."[9]  Mass. G. Evid. § 901 (a). See Commonwealth v. Rodriguez, 457 Mass. 461, 476 (2010), abrogated on other grounds, Marshall v. Commonwealth, 463 Mass. 529, 535 (2012).

Although improper, the admission of exhibit nos. 75 through 79 did not create a substantial risk of a miscarriage of justice.  See Commonwealth v. Rivera, 464 Mass. 56, 78 & n.22, cert. denied, 570 U.S. 907 (2013).  The evidentiary value of those three photographs was cumulative of other admissible evidence -- specifically, Dr. Sarkar's testimony about the size and general placement of the victim's wounds in the aftermath of the stabbing.  See Reavis, 465 Mass. at 883-884.  There was no dispute about the victim's cause of death, see id., and the photographs did not bear on the defendant's claim that someone

---

[8] The victim's autopsy was performed before Dr. Shah joined the Office of the Chief Medical Examiner.

[9] The Commonwealth did not authenticate those photographs with testimony of a witness to the autopsy, such as a police officer or photographer.  See Commonwealth v. Rivera, 464 Mass. 56, 78 & n.22, cert. denied 570 U.S. 907 (2013).  Although the Commonwealth moved to expand the record on appeal to provide documentation of the lead investigator's presence at the victim's autopsy, that motion was denied.

other than he administered the fatal wounds.  See Rodriguez, 457 Mass. at 477.

iii.  Unfair prejudice apart from authentication.  We are likewise unpersuaded that the photographs were unfairly prejudicial based on either their depiction of the body before the autopsy or because of markings made on some of the photographs.[10]  "The question whether the inflammatory quality of a photograph outweighs its probative value and precludes its admission is determined in the sound discretion of the trial judge."  Commonwealth v. Alleyne, 474 Mass. 771, 779 (2016), quoting Commonwealth v. Amran, 471 Mass. 354, 358 (2015).  The photographs here were clearly probative of the elements of murder.  See Commonwealth v. Walters, 485 Mass. 271, 283 (2020); Alleyne, supra at 779.  This was true even where the images depicted evidence of pre- and postmortem surgical procedures, rulers for scale, and numerals for identifying wounds.  The photographs themselves were not "inflammatory."  Cf. Commonwealth v. St. Peter, 48 Mass. App. Ct. 517, 523 (2000). We cannot say the judge abused his discretion in admitting the photographs.

---

[10] Additionally, we do not agree that in this case, the failure of the judge to give a sua sponte "limiting/cautioning" instruction amounted to an abuse of discretion.  Commonwealth v. St. Peter, 48 Mass. App. Ct. 517, 523 n.3 (2000), cited by the defendant, is not to the contrary.

10

c. _Victim's girlfriend's testimony_. The victim's girlfriend (girlfriend) testified before the grand jury about the victim's adversarial relationship with the defendant and with Mypre's members generally. She also testified that the victim had a criminal history and that he held a grudge against the defendant based on his belief that the defendant had participated in stealing drugs from the victim's brother. Prior to trial, the prosecutor and defense counsel discussed "bringing up past history" and agreed "not [to] get[] into any of that." On direct examination at trial, the girlfriend denied any familiarity with Mpyre, any awareness that "[the victim] had any issues with these Mpyre kids," and any knowledge the victim carried weapons on him that day. The girlfriend testified to her view of the victim as "[s]o loving, caring, very smart, caring so much for his mother, his grandmother, brothers, aunts and uncles, family and friends. He was awesome."

The defendant's first challenge to the girlfriend's testimony -- that it "erroneously suggest[ed] [that] [the victim] was not the aggressor and . . . falsely suggest[ed] [that] [the defendant] acted with a pre-existing intent to start a fight" -- was not preserved at trial. In any event, trial counsel's failure to object to it was consistent with the defense theory that Hairston, and not the defendant, committed the fatal stabbing. The defendant did not argue either self-

11

defense or defense of another and accordingly, as trial counsel made clear, did not rely on Adjutant evidence.[11]  See Commonwealth v. Adjutant, 443 Mass. 649, 664 (2005).  See also Commonwealth v. Souza, 492 Mass. 615, 620-621 (2023).

The defendant's second challenge to the girlfriend's testimony was not preserved at trial and fares no better.  The girlfriend's "misleading" trial testimony did not entitle the defendant to cross-examine her by asking about the victim's prior bad acts.  The inconsistent testimony about which the defendant now complains (disclaiming knowledge of "what Mpyre was" or "that [the victim] had any issues with these Mpyre kids") was the result of a pretrial agreement between the prosecutor and defense counsel to avoid any reference to the "drug rip" that was the source of the victim's ill will toward the defendant.  Even if the prosecutor could have conducted the direct examination so as to avoid soliciting testimony about the victim's prior criminal behavior, any inconsistencies in the girlfriend's testimony did not create a substantial risk of a

---

[11] "Adjutant evidence constitutes evidence of 'specific acts of prior violent conduct that the victim is reasonably alleged to have initiated,' Commonwealth v. Adjutant, 443 Mass. 649, 664 (2005) . . . , offered by the defendant 'for the limited purpose of supporting the defendant's self-defense claim that the victim was the first aggressor.'  Id. at 660."  Commonwealth v. Chambers, 465 Mass. 520, 521 n.1 (2013).

12

miscarriage of justice.  See Commonwealth v. Valentin, 470 Mass. 186, 188-189 (2014).

We are similarly unpersuaded that the girlfriend's testimony that, after seeing the defendant in the doorway of the Cumberland Farms store, the victim told her to wait in the car because "the Mpyre kids [were] in the store and [] if they were going to start with somebody, to have them start with him," was inadmissible hearsay.  Even if it was hearsay, however, its admission did not create a substantial risk of a miscarriage of justice where the jury rejected the first-degree murder charge. Commonwealth v. Evans, 438 Mass. 142, 152-153 (2002).  The victim's statement did no more than signal a mutual dislike between the victim and members of the Mpyre group; to the extent it also suggested that the victim was the aggrieved party, nothing turned on who started the fight between the victim and the codefendants.  See Souza, 492 Mass. at 621.

Finally, to the extent that the defendant raises a challenge to the judge's refusal to allow trial counsel to cross-examine the girlfriend about the victim's prior bad acts, based on her brief description of the victim as "a loving, kind guy," nothing about that aspect of the girlfriend's testimony "blew the door open on [the victim's] prior reputation," as defense counsel argued at trial.  "[T]he prosecutor is entitled to tell the jury something of the person whose life ha[s] been

13

lost in order to humanize the proceedings."[12]  Commonwealth v.

Santiago, 425 Mass. 491, 495 (1997), S.C., 427 Mass. 298 and 428

Mass. 39, cert. denied, 525 U.S. 1003 (1998).  See Commonwealth

v. Holliday, 450 Mass. 794, 816, cert. denied sub nom. Mooltrey

v. Massachusetts, 555 U.S. 947 (2008).

d.  Testimony on "pointed structure."  The fight between

the victim and Garcia, Hairston, Frye, and the defendant was

recorded from several angles by a video surveillance system

inside the Cumberland Farms store.  The videos were admitted in

evidence and played for the jury.  The lead investigator,

Massachusetts State Trooper Paul MacDonald, testified that he

reviewed the video recordings frame by frame as part of his

effort to determine whether any of the participants in the fight

had a knife.  He testified, without objection and in response to

questions about what he saw, "There was a dark pointed structure

in [the defendant's] hand."[13]  The next day, defense counsel

moved to strike Trooper MacDonald's testimony about the object.

The judge agreed that the testimony should not have been

admitted and provided a curative instruction in his final charge

to the jury:  "Witnesses may have testified to their opinions as

_____

[12] Defense counsel did not seek to revisit the prior agreement by examining the girlfriend about her grand jury testimony on the grounds that it was inconsistent with her trial testimony that the defendant was "nice" and "awesome."
[13] He reviewed the video in sequential frames and concluded that the object "wasn't just a marking on the video or on the floor."

14

to what is depicted in the surveillance photographs.  You are to discard such opinion evidence.  It is for you to decide what is shown in those photographs."  Assuming without deciding that the issue was preserved and that Trooper MacDonald's testimony about seeing an object should not have been admitted, we are confident that the judge's instruction coupled with the ability of jurors to view the video for themselves obviated any risk of prejudice.  Commonwealth v. Silva, 482 Mass. 275, 290 (2019) (jury presumed to follow all instructions given).

e.  Jury instruction.  While providing the instruction on the intent required to prove murder in the second degree, the judge started to include a portion of an instruction on the crime of assault with a dangerous weapon, but he immediately recognized his error.[14]  Specifically, the judge said, "You should consider whether based on the objective conditions existing at the time of the assault, the exhibition of the instrument could reasonably engender the victim's fear and whether the perpetrator --."  At that point, the judge said, "I'm sorry," and went on to the next jury instruction.  The defendant did not object.

_____

[14] The misplaced instruction followed on the judge's proper provision of a definition for "dangerous weapon" in the context of the murder charge.

15

"[E]valuat[ing] the instruction as a whole, looking for the interpretation a reasonable juror would place on the judge's words," Commonwealth v. Vargas, 475 Mass. 338, 349 (2016), quoting Commonwealth v. Young, 461 Mass. 198, 207 (2012), we are satisfied that the error did not create a substantial risk of a miscarriage of justice. Commonwealth v. Curran, 488 Mass. 792, 794 (2021); Commonwealth v. Ortiz, 487 Mass. 602, 611-612, 614-615 (2021). Reading the trial transcript in a common-sense way, we are confident that a reasonable juror would understand the judge's abrupt abandonment of that strand of the instruction, and his apology, to mean that the instruction was a mistake. In any event, we fail to see how this particular sentence could have prejudiced the defendant. The fact that he was ultimately convicted of manslaughter, and not murder, contributes to our conclusion that it did not do so. See Commonwealth v. Grinkley, 75 Mass. App. Ct. 798, 806 (2009).

f. Prosecutor's closing argument. We discern no merit in the defendant's argument that the prosecutor improperly referred to facts not in evidence in her closing argument. First, the prosecutor did not "misstate[] the trial evidence" when she argued that of the Mpyre members present at the Cumberland Farms when the victim arrived there, "[the jury] heard testimony that the person that [the victim] had an issue with was the defendant," and that neither Hairston nor Garcia knew who the

16

victim was.  The girlfriend testified that immediately upon arriving in the Cumberland Farms parking lot the victim recognized the defendant as an "Mpyre kid[]," and suggested to her that the "Mypre kids" might cause trouble if she went into the store.  This evidence, along with the testimony of both Hairston and Garcia denying that they had ever seen the victim before he entered the store, permitted the inferences that the prosecutor suggested.  See Commonwealth v. Niemic, 483 Mass. 571, 592 (2019) (prosecutor may argue reasonable inferences drawn from the evidence); Commonwealth v. Mack, 482 Mass. 311, 323 (2019) (same).

There was likewise proper grounding for the prosecutor's argument that the blue-handled knife was "the only knife" "capable of inflicting the injuries that killed [the victim]." The jury heard that the fatal wounds were "deep," going through the heart and, separately, into the victim's abdomen "almost to the spine."  Based on Hairston's testimony that the defendant went to the Cumberland Farms with a "long hunting knife" with a blue handle in a "harness," the video recordings depicting the defendant with a scabbard on his hip, the recovery of a ten to twelve inch scabbard on the path followed by the codefendants as they fled from the site of the stabbing, and the evidence that both of the other knives connected to the codefendants were less than four inches long, this argument, too, was a reasonable

17

inference drawn from the evidence.[15]  See Niemic, 483 Mass. at 592; Mack, 482 Mass. at 323.

Finally, the prosecutor's statement "that [the victim] never struck any blows" was an accurate observation.  Neither the witnesses' testimony nor the surveillance video showed the victim "striking any blows."[16]  Indeed, the evidence was uncontroverted that after the initial scuffle with Garcia, the defendant did little more than cover himself defensively with his hands.[17]

g.  Sufficiency of the evidence.  As relevant to this case, "[v]oluntary manslaughter is an unlawful killing arising not from malice, but from . . . sudden passion induced by . . . sudden combat[.]"  Commonwealth v. Yat Fung Ng, 489 Mass. 242, 257 (2022), quoting Commonwealth v. Acevedo, 446 Mass. 435, 443 (2006).  Viewing the evidence in the light most favorable to the Commonwealth, see Commonwealth v. Latimore, 378 Mass. 671, 677

---

[15] Additionally, although not indicative of the "capab[ility]" of the knife with the blue handle to inflict the fatal injuries here, there was evidence at trial that the blade of that knife -- and only that one -- bore traces of the victim's DNA and other indicia of having been introduced into a person's body.

[16] Both Hairston and Garcia affirmatively denied that the victim ever "struck" them or Frye.

[17] We discern no merit in the defendant's argument that he was prejudiced at the 2016 trial in this matter by a statement the trial prosecutor made nearly a year later, as part of a 2017 plea colloquy in Jared Frye's case, that "the testimony at Goshen's trial showed [the victim] landed one or two blows."

(1979), we are satisfied that the evidence was sufficient to support the defendant's conviction.

Hairston's testimony put the blue-handled knife in the defendant's possession before the Mpyre group arrived at the Cumberland Farms, and Garcia testified that while the victim was being beaten by Hairston and Frye inside the Cumberland Farms, he saw the defendant "enter[] the fight" with the blue-handled knife and stab the victim four or five times with it. Hairston testified that after he and the others fled from the Cumberland Farms, the defendant bragged about stabbing the victim, saying, "I poked that n----; I poked that n----." Later, he apologized and told Garcia "He didn't know why he did it." When the blue-handled knife was found, forensic testing revealed on it both the victim's DNA and a "greasy substance" consistent with its having been used to stab someone in the body. Viewed in the light most favorable to the Commonwealth, this evidence was sufficient to meet the Latimore standard.

That there was other evidence from which a jury could have drawn a different conclusion is of no consequence on appeal. See Commonwealth v. Ragland, 72 Mass. App. Ct. 815, 832 (2008). Where the evidence pointed to the defendant as the only person to have stabbed the victim, and the only one whose knife bore the indicia of having been used for that purpose, the Commonwealth was not required to rule out all other

19

possibilities.  See Commonwealth v. Morgan, 449 Mass. 343, 349
(2007).

2.  Motion for a new trial.  a.  Ineffective assistance.
To prevail on a claim of ineffective assistance of counsel, a
defendant must show that trial counsel's representation fell
"measurably below that which might be expected from an ordinary
fallible lawyer," and that the defendant was "likely
deprived . . . of an otherwise available, substantial ground of
defence" as a result.  Commonwealth v. Saferian, 366 Mass. 89,
96 (1974).  See Commonwealth v. Kolenovic, 471 Mass. 664, 673
(2015).  "[W]e review a judge's decision on a defendant's motion
for a new trial based on the common-law claim of newly
discovered evidence for a significant error of law or other
abuse of discretion."  Commonwealth v. Vaughn, 471 Mass. 398,
404 (2015), quoting Commonwealth v. Sullivan, 469 Mass. 340, 351
(2014).

i.  Reasonableness of counsel's strategic decisions.  The
defendant's claims that trial counsel fell short in failing to
hire a pathology expert, request a jury instruction on defense
of another, and -- "interconnected with" the decision not to
pursue such an argument -- introduce evidence of the victim's
prior antagonism toward the defendant and Mpyre, all challenge

20

his lawyer's strategic decisions.[18]  Accordingly, "the test is whether the decision was 'manifestly unreasonable' when made." Kolenovic, 471 Mass. at 674, quoting Acevedo, 446 Mass. at 442. "Although our cases applying the manifestly unreasonable test have not precisely marked the limits of a trial attorney's prerogative to make strategic decisions, we have been clear that reasonableness does not demand perfection." Kolenovic, supra at 674.

At the hearing on the defendant's motion for a new trial, Elizabeth Laposata, M.D., testified as an expert witness in forensic pathology.  While the judge found, consistent with Dr. Laposata's opinion, that only one of the victim's wounds was fatal, that none of the three knives recovered after the stabbing could be ruled out as the fatal weapon,[19] and that the presence of blood or biological material on a weapon was only one factor important to the determination of whether a particular knife was used in the stabbing, he rejected the defendant's argument that trial counsel was ineffective in failing to call an expert pathologist to testify to these points.  We discern no abuse of discretion in the judge's

---

[18] To the extent that the defendant suggests that the failure to consult or call a pathology expert was not a strategic decision, we read the affidavit of trial counsel to support a different conclusion.

[19] And that the same was true of the missing fourth knife.

conclusion.  Such testimony would not have aided the defense theory of the case -- that the defendant "didn't do anything" and only entered the fray with the victim after "[the] stabbing [was] over and done."  See Commonwealth v. Jacobs, 488 Mass. 597, 606-607 (2021); Commonwealth v. Montez, 450 Mass. 736, 758-759 (2008).  "An unsuccessful defense strategy does not amount to ineffective assistance of counsel, even if different strategies were available or conceivable."  Commonwealth v. Denson, 489 Mass. 138, 152 (2022).

Likewise, the motion judge acted within his discretion in rejecting the defendant's challenge to his trial counsel's decision not to argue or request an instruction on defense of another.  "The elements of defense of another are well settled: 'An actor is justified in using force against another to protect a third person when (a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such force to protect himself.'"  Commonwealth v. Castillo, 485 Mass. 852, 856 (2020), quoting Commonwealth v. Allen, 474 Mass. 162, 168 (2016).  First, as to the reasonableness of trial counsel's decision, the motion judge considered "the obstacles to admitting into evidence [the victim's] prior threats and acts of violence" --

22

namely, the defendant's decision not to testify and the unavailability of other witnesses to the victim's prior threatening conduct.[20]  Without that evidence and given the jury's ability to watch the fight unfold on the surveillance video, the motion judge acted well within his discretion in concluding that trial counsel made a reasonable tactical decision not to argue defense of another.  See Commonwealth v. Boria, 460 Mass. 249, 253 (2011).

Even if that were not the case, the defendant has not shown that he was prejudiced.  The evidence at trial was undisputed that at the time the defendant entered the fight between the codefendants and the victim, the victim was sheltering himself from the blows of the codefendants and was not fighting anyone, making it unlikely that a jury would have found the defendant's use of deadly force to be either reasonable or justified.  See Castillo, 485 Mass. at 856.

---

[20] Additionally, the motion judge considered that introducing evidence of the victim's antagonistic relationship with the defendant and Mypre ran an obvious risk of inviting the Commonwealth to introduce responsive evidence suggesting that the defendant had participated in the theft of drugs from the victim's brother.  See Mass. G. Evid. § 804 (b) (3).  See also Montez, 450 Mass. at 758 (not manifestly unreasonable for defense counsel to deemphasize prior bad act evidence).  Likewise, by introducing evidence of the victim's misconduct toward the defendant and his Mpyre associates, defense counsel would have risked suggesting to the jury that the defendant had a motive to retaliate against the victim.  See Commonwealth v. Hensley, 454 Mass. 721, 741-742 (2009).

ii. _Failure to object_. The defendant points to trial counsel's failure to object to the introduction of the autopsy photographs, Dr. Shah's testimony about the details of the autopsy, Trooper MacDonald's lay opinion about the "dark, pointed object," and the girlfriend's account of what the victim said to her before he entered the Cumberland Farms store as evidence of ineffective assistance at trial. Where we have considered the subject matter of each of these claims as part of our previous analysis and have determined that any error in the admission of the evidence did not create a substantial risk of a miscarriage of justice, we are satisfied that the motion judge acted within his discretion in rejecting the defendant's ineffective assistance argument on these points. See Commonwealth v. Curtis, 417 Mass. 619, 624 n.4 (1994).

iii. _Notice of sentencing appeal and constitutionality of sentence_. In his motion for new trial, the defendant argued that trial counsel provided him with ineffective assistance of counsel by failing to ensure that a timely sentencing appeal was filed with the Appellate Division of the Superior Court as provided in G. L. c. 278, § 28A. He also challenged the constitutionality of his sentence. Because, as we discuss _infra_, we conclude that the motion judge did not abuse his discretion in allowing the defendant's motion for a new

24

sentencing hearing, we need not address either of these arguments.[21]

3. Commonwealth's appeal.[22] The defendant's motion for a new trial included an alternative request for a new sentencing hearing. Although the judge denied the defendant's request for a new trial, he allowed the defendant's alternative request by granting him a new sentencing hearing based upon ineffective assistance of counsel.[23] The Commonwealth appealed from that decision. Treating the motion for resentencing as filed under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), see Commonwealth v. Talbot, 444 Mass. 586, 593 (2005), we cannot

---

[21] We likewise decline the defendant's invitation to extend the constitutional protections extended to juvenile offenders in Commonwealth v. Perez, 477 Mass. 677, 688 (2017) to eighteen year old offenders. We are aware that the issue framed by the defendant is presently under consideration by the Supreme Judicial Court in Commonwealth v. Mattis, SJC-11693.

[22] Although it is unnecessary to detail the proceedings here, the parties filed a flurry of motions before the single justice of this court, all related to the Commonwealth's delay in filing its brief in connection with its cross appeal. Ultimately, the single justice allowed the Commonwealth to file its brief late; he also allowed both parties to file nonconforming briefs, each of which exceeded the page limits prescribed by Mass. R. A. P. 16 (h), as appearing in 481 Mass. 1628 (2019). The single justice referred to this panel the defendant's renewed motion to dismiss the Commonwealth's appeal. We do not condone the Commonwealth's delay, but we deny the defendant's motion to dismiss the Commonwealth's appeal.

[23] On June 6, 2016, the defendant filed a timely motion to revise and revoke his sentence under Mass. R. Crim. P. 29, as amended, 489 Mass. 1503 (2022). The trial judge took no action on the motion. The defendant does not argue that he is entitled to relief under rule 29, and we do not consider the question further.

conclude that the motion judge erred or abused his discretion in granting the defendant a new sentencing hearing. See Commonwealth v. Plasse, 481 Mass. 199, 204 (2019). Because we are satisfied that the motion judge's findings support a conclusion that, in these circumstances, "justice may not have been done," see Mass. R. Crim. P. 30 (b), at the original sentencing, we affirm.[24]

At the sentencing hearing, defense counsel argued for leniency, citing "mitigating circumstances" including the defendant's age, family circumstances, and lack of criminal record. In support of the defendant's motions for a new trial and a new sentencing hearing, Frank DiCataldo, Ph.D., a clinical psychologist, testified that research existed at the time of sentencing that would have supported an additional proposition: that is, at the time of the stabbing, the defendant was, for the purposes of brain development, an adolescent, not an adult. In his testimony and in an affidavit supporting the defendant's motion for a new trial, Dr. DiCataldo averred that the defendant lacked the brain development, maturity, judgment, and impulse control of an adult. Dr. Cataldo stated that he "regularly"

_____

[24] In doing so, we need not and do not reach the question whether trial counsel was ineffective in failing to develop and present evidence concerning adolescent brain development at the sentencing hearing. See Commonwealth v. Henry, 488 Mass. 484, 495 (2021) (appellate court may affirm on grounds different from those relied upon by the motion judge).

26

testified about brain development in adolescents -- a category he testified was defined in the relevant scientific community to include eighteen year olds -- and had done so for nearly a decade before the defendant's case went to trial.

It is apparent from the judge's memorandum of decision that he credited Dr. DiCataldo's statements.  We "defer[] to [the motion] judge's assessment of the credibility of the witnesses."  See Commonwealth v. Cruz, 90 Mass. App. Ct. 60, 65 (2016), quoting Commonwealth v. Grace, 397 Mass. 303, 307 (1986).  Considering Dr. DiCataldo's testimony, the motion judge could properly have concluded that the defendant would have benefitted from an opportunity to introduce available evidence suggesting that the defendant's "psychosocial immaturity . . . [left him potentially] more likely to act impulsively, to act aggressively, to be influenced by peer pressure, to misread social cues and perceived threats, and to overreact or react excessively than an adult."  The same research would have provided the defendant with the opportunity to argue that "because of [the defendant's] youth and psychosocial immaturity, he ha[d] a greater overall capacity for maturation, behavior change, personality development and desistence from violence compared to adults."  See Plasse, 481 Mass. at 205.  The judge was not compelled to reach the conclusion that he did, but we

27

are satisfied that he acted within his discretion in doing so. See _Talbot_, 444 Mass. at 593; Mass. R. Crim. P. 30 (b).

    _Conclusion_.  The defendant's conviction is affirmed.  The orders denying the defendant's motion for a new trial and allowing his motion for a new sentencing hearing are affirmed.[25]

                          _So ordered_.

                          By the Court (Vuono, Hand & Hodgens, JJ.[26]),

_Joseph F. Stanton_

Clerk

Entered:  October 3, 2023.

---

[25] In doing so, we express no opinion on the appropriateness of the defendant's current sentence.

[26] The panelists are listed in order of seniority.