NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-129

COMMONWEALTH

vs.

JUAN RODRIGUEZ.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

On June 8, 2022, following a bench trial in the District Court, Juan Rodriguez (defendant) was found guilty of operating under the influence of liquor (count I), leaving the scene of personal injury (count II), and negligent operation of a motor vehicle (count V).[1]  The defendant now appeals, asserting that there was insufficient evidence to convict him of leaving the scene of personal injury.  The defendant also argues that the trial judge committed reversible error by prohibiting expert opinion testimony as to the cause of the accident and asserts

_____

[1] The defendant was acquitted of leaving the scene of property damage (count III), unlicensed operation of a motor vehicle (count IV), and a number plate violation (count VI).

that he is entitled to a new trial due to ineffective assistance of counsel.  Id.  Because we agree that the Commonwealth failed to present sufficient evidence to convict the defendant of leaving the scene of personal injury, we reverse his conviction as to count II, but otherwise we affirm.

Background.  On November 20, 2020, around 10:30 P.M., New Bedford police responded to a 911 call regarding a motor vehicle accident that occurred in the area of Penniman Street and Purchase Street.  The call was placed by Sophia Leite (Leite), who was skating at a skate park nearby when the accident occurred.  At trial, Leite testified that she heard "a loud like bang or crash noise" and when she looked over, she saw a black car stopped with its hazard lights on in a parking lot located "pretty far" from the skate park.  She testified that the car then moved forward from its position in the parking lot and crashed into a fence that separated the parking lot from the side street.[2]  Leite also saw "a pedestrian that ended up getting run over too, but she . . . just got right up [and] [s]he looked like she was fine."  Leite did not know whether the pedestrian was injured because the pedestrian "just kept on walking" and left the scene.  Leite was also unsure whether the vehicle

_____

[2] Leite testified that the entire parking lot was gated by a fence.

2

struck the pedestrian before striking the fence, or if the vehicle caused the fence to strike the pedestrian. Leite testified that after the vehicle hit the fence, the vehicle backed up and was then facing Penniman Street. Leite testified that the driver, later identified as the defendant, exited the car. Leite eventually approached the defendant and asked him if he was okay and whether it was okay for her to call 911, to which the defendant responded yes. When Leite was speaking on the phone with 911, she observed the defendant get back into his vehicle, exit the parking lot, and drive down Penniman Street where he proceeded to collide with multiple parked cars.

When police arrived at the scene, Officer James Ryan (Ryan) found the defendant in his vehicle which was "partially on the sidewalk and the street against the building of 27 Penniman [Street]." Ryan testified that the defendant was unable to get out of his vehicle without assistance, was unsteady on his feet, and that both the vehicle and the defendant's person smelled like alcohol. Ryan also stated that the defendant seemed confused, his eyes were bloodshot and glossy, and his speech was slurred. Id. Shortly after helping the defendant exit his vehicle, Ryan placed him under arrest and transported him to the police station for booking. Id.

The defendant, who testified in his own defense at trial, recalled his version of the events of the evening of November

3

20, 2020, which began when he was driving home from work in Fall River to his home in New Bedford.  He testified:

> "So I have an ear pod in and with the ear pod, one, it tells me GPS, because I don't know where I'm going. You know, so, one, when I noticed I didn't have one in my ear, so I had none, I tend to panic a bit and -- because I don't know where I'm going.  My phone is off, and I can't call nobody.  I don't have wifi, so I panicked a bit, and when I noticed it wasn't in, I didn't know what was going on and that's the last thing I remember."

That testimony notwithstanding, the defendant did testify that he remembered being detained at the police station following his arrest.[3]  At trial, the Commonwealth moved to admit a booking video taken at the police station that depicted the defendant yelling to police officers, failing to respond to questions, and swaying as he stood.  The defendant's trial counsel elected not to view the video when given the opportunity to do so by the trial judge, and, after some discussion, stated she had "[n]o objection at all" to its admission, reasoning that "it's not about my client being impaired.  It's about the cause of impairment."  The defendant's trial counsel also did not object to the admission of medical records of a pedestrian who visited the hospital after she was purportedly struck by either the fence or the defendant's vehicle.

_____

[3] Notably, the defendant did not testify that he consumed or was ever in the presence of alcohol on the evening of November 20, 2020.

4

Finally, the trial judge permitted the defendant's expert witness, Dr. Mark Friedman (Dr. Friedman), to testify that the defendant's behavior and symptoms on the evening of November 20, 2020, were consistent with a seizure disorder. However, the trial judge did not permit Dr. Friedman to testify to his opinion about the direct cause of the crashes.

Discussion. 1. Sufficiency of the evidence. The defendant argues that the evidence was insufficient to convict him of leaving the scene of personal injury because the Commonwealth failed to prove beyond a reasonable doubt that he knowingly collided with or injured another person when he was operating his vehicle on the night of November 20, 2020. On this record, we agree.

When reviewing claims of insufficient evidence presented at trial, "we assess the evidence in the light most favorable to the Commonwealth 'to determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt.'" Commonwealth v. Baez, 494 Mass. 396, 400 (2024), quoting Commonwealth v. Robinson, 493 Mass. 303, 307 (2024). "The evidence may be direct or circumstantial, and we draw all reasonable inferences in favor of the Commonwealth" (quotations and citations omitted). Baez, supra.

To prove leaving the scene causing personal injury, the Commonwealth must show that that the defendant (1) operated a

5

motor vehicle; (2) on a public way; (3) knowingly collided with or otherwise caused injury to another person; and (4) went away without stopping or making known his name, address, and the registration number of his vehicle. See G. L. c. 90, § 24 (2) (a 1/2) (1); Commonwealth v. Muir, 84 Mass. App. Ct. 635, 638 (2013). See Commonwealth v. Rijo, 98 Mass. App. Ct. 871, 875 (2020) (finding "knowingly" modifies both collided with and caused injury). Knowledge of a collision "requires the Commonwealth to prove that the defendant knew he collided with a person 'or otherwise' caused injury to a person." Commonwealth v. Daley, 463 Mass. 620, 626 (2012) (emphasis added).[4] Therefore, to prove the element of knowledge, the Commonwealth had to prove that the defendant either (1) knowingly collided with the pedestrian or (2) knowingly caused injury to the pedestrian. Id. Here, the Commonwealth has failed to do so in either respect.

The Commonwealth offers no direct evidence regarding how precisely the pedestrian ended up on the ground. For example, Leite, the only eyewitness to at least some of the accident, testified that after hearing a loud bang she saw the vehicle

---

[4] While the decision in Daley, 463 Mass. at 626, interpreted G. L. c. 90, § 24 (2) (a 1/2) (2), which criminalizes leaving the scene of an accident resulting in death, the decision applies with equal force to G. L. c. 90, § 24 (2) (a 1/2) (1), as the applicable statutory language is identical.

6

move forward from its position in the parking lot, crash into the fence, and "also saw like a pedestrian that ended up getting run over too." However, she was "not sure what like got hit first, if it was the fence or like the fence hit the pedestrian."[5]

More importantly, there was no evidence from which a jury could reasonably infer that the defendant knew that he collided with or caused injury to the pedestrian. The events occurred at night. Leite testified that after the pedestrian was struck by either the fence or the defendant's vehicle she immediately got up and "just kept walking." Leite did not testify that she told the defendant that he hit the pedestrian or that he said he knew he hit the pedestrian. There was no evidence that the defendant ever saw the pedestrian. Therefore, given the nature of the accident, the pedestrian's actions in getting right up and walking away, and the observation by the witness that the pedestrian "looked like she was fine" after she was hit, it cannot be reasonably inferred that the defendant knew -- either that he had collided with the pedestrian or that she was injured. See Rijo, 98 Mass. App. Ct. at 873-874.

---

[5] Leite's testimony, although not entirely clear, seems to suggest that the pedestrian was walking by the parking lot, presumably on the sidewalk or street on other side of the fence line, when the defendant struck her or the fence.

Accordingly, the evidence presented at trial, when viewed in the light most favorable to the Commonwealth, was insufficient to conclude beyond a reasonable doubt that the defendant knowingly collided with or caused injury to the pedestrian. Baez, 494 Mass. at 400; Daley, 463 Mass. at 626. As such, the defendant's conviction as to Count II shall be reversed.

2. Expert testimony. The defendant also contends that the trial judge committed reversible error by improperly limiting Dr. Friedman's testimony by not permitting him to testify that the accident was caused by the defendant suffering a seizure. The argument is unavailing.

Before trial, the parties argued the defendant's motion in limine concerning, inter alia, whether Dr. Friedman should be permitted to testify as a medical expert and whether his expert report should be admitted.[6] After hearing these arguments, the

_____

[6] During the motion argument, the defendant's trial counsel stated that she expected Dr. Friedman to testify that, based upon a review of the defendant's medical records and Dr. Friedman's evaluation of the defendant by telephone, the defendant suffers from a seizure disorder which caused the accident. The Commonwealth argued that Dr. Friedman's testimony and his expert report were irrelevant because they were based upon a limited sample of outdated medical records and a singular telephonic medical evaluation. The Commonwealth also argued that the conclusion in Dr. Friedman's report that the cause of the accident was due to a seizure disorder should be reserved for the trier of fact.

8

trial judge concluded that Dr. Friedman's report would not be admitted, but that he could be called as an expert witness. The trial judge did not rule on the permissible scope of Dr. Friedman's testimony at that time. At trial, the trial judge permitted Dr. Friedman to testify that the defendant's symptoms were consistent with a seizure disorder but stopped him from testifying that a seizure caused the accident, stating that he could not "give an opinion as to the cause of the accident." Because the defendant's trial counsel failed to object, our review is limited to whether the alleged error created a substantial risk of miscarriage of justice. Commonwealth v. Robinson, 480 Mass. 146, 147 (2018). In concluding that a miscarriage of justice did not result, we note that "[w]here testimony approaches an ultimate issue of guilt, 'the probative value of the opinion must be weighed against the danger of unfair prejudice.'" Commonwealth v. Goddard, 476 Mass. 443, 446-447 (2017), quoting Commonwealth v. Canty, 466 Mass. 535, 544 (2013).

Here, the danger of unfair prejudice arising from Dr. Friedman's anticipated testimony that the crash was caused by the defendant suffering a seizure was high because it goes directly to the defendant's guilt or innocence. Goddard, 476 Mass. at 447. Conversely, the probative value of Dr. Friedman's opinion as to the cause of the accident was weakened by the fact

9

that Dr. Friedman had only reviewed medical records from when the defendant was a minor, none of which revealed that the defendant had a seizure disorder, and the fact the Dr. Friedman's only communication with the defendant was during a single evaluation over the telephone.  Accordingly, the trial judge did not err in limiting Dr. Friedman's testimony.

3.  <u>Ineffective Assistance of Counsel</u>.  The defendant further asserts that his trial counsel was ineffective because she failed to review his booking video or cause Dr. Friedman to view the video to aid his testimony before consenting to its admission at trial.[7]  We are not persuaded.

Counsel is ineffective when "(1)'there has been serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinarily fallible lawyer'; and (2) as a result, the defendant was 'likely deprived . . . of an otherwise available, substantial ground of defence.'"  <u>Commonwealth</u> v. <u>Henley</u>, 488 Mass. 95, 134 (2021), quoting <u>Commonwealth</u> v. <u>Saferian</u>, 366 Mass. 89, 96 (1974).  The burden of proving an

---

[7] The defendant also asserts that his trial counsel's failure to object to the admission of the pedestrian's medical records amounted to ineffective assistance of counsel.  While we question the force of this argument given the wide discretion afforded judges as the gatekeeper of the evidence, <u>Commonwealth</u> v. <u>Meola</u>, 95 Mass. App. Ct. 303, 308-309 (2019), because his conviction as to Count II is reversed, we need not address it.

10

ineffective assistance claim is on the defendant.  Commonwealth v. Montez, 450 Mass. 736, 755 (2008).

When the ineffective assistance claim is "based on a tactical or strategic decision, the test is whether the decision was 'manifestly unreasonable' when made."  Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), quoting Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006).  Manifestly unreasonable decisions refer only to "strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent."  Kolenovic, supra, quoting Commonwealth v. Pillai, 445 Mass. 175, 186-187 (2005).

Although the defendant's trial counsel did not elect to view the booking video after being given the opportunity to do so, her decision to consent to its admission was strategic.  Counsel's strategy was dictated on the record when she stated that she had "[n]o objection at all" to the admission of the booking video because the defendant's defense is "not about my client being impaired.  It's about the cause of impairment."[8]

---

[8] When the Commonwealth sought to introduce the booking video, the defendant's trial counsel initially objected stating she "was not provided with this booking video" and "would very much like [her] expert witness to have the opportunity to testify (indiscernible) the content."  However, she then declined the trial judge's offer to review the video and withdrew her objection because the video did not speak to the cause of the defendant's impairment.

Therefore, because the central dispute at trial was the root of the defendant's impairment, the defendant's trial counsel evidently thought that the introduction of video evidence displaying the defendant in an impaired state was inconsequential.  We conclude that, while the better practice would have been for the defendant's trial counsel to view the booking video, we cannot say it was "manifestly unreasonable" for the defendant's trial counsel to fail to object to its admission in light of the defendant's overall defense strategy. Kolenovic, 471 Mass. at 674.  Furthermore, while Dr. Friedman was not given the opportunity to review the video to aid his testimony, we are unconvinced that Dr. Friedman's failure to view the video deprived the defendant of a "substantial ground of defence," or that the video would have bolstered Dr. Friedman's testimony in any meaningful way (citation omitted).[9] Henley, 488 Mass. at 134.  As such, the defendant's trial counsel was not ineffective.

For the foregoing reasons, we reverse the judgment of conviction on count II, the finding is set aside, and judgment

---

[9] The defendant did not submit an affidavit from Dr. Friedman that viewing the video would have aided his testimony.

12

shall enter for the defendant on count II.  The judgments on counts I and V are affirmed.

So ordered.

By the Court (Henry,
  Desmond & Englander, JJ.[10]),

Clerk

Entered:  April 3, 2025.

---

[10] The panelists are listed in order of seniority.